952 So.2d 206 (2006)
Patrick Dean LATTIMER, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-00806-COA.
Court of Appeals of Mississippi.
April 25, 2006.
Rehearing Denied October 31, 2006.
*209 Matthew Warren Kitchens, James W. Kitchens, Jackson, attorneys for appellant.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before KING, C.J., BARNES and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. On March 16, 2004, a jury sitting before the Walthall County Circuit Court found Patrick Dean Lattimer guilty of two counts of sexual battery. On April 8, 2004, the circuit court sentenced Lattimer to two thirty-year sentences. However, the circuit court modified the two sentences and sentenced Lattimer to twenty years incarceration, to be followed by ten years of post-release supervision. Additionally, the circuit court set the two sentences to run consecutively.
¶ 2. Posttrial, Lattimer filed an unsuccessful motion for judgment notwithstanding the verdict or, alternatively, a motion for new trial. Aggrieved, Lattimer appeals *210 and raises eight issues, listed verbatim:
I. THE TRIAL COURT ERRED DURING JURY SELECTION.
II. THE TRIAL JUDGE ERRED BY ALLOWING TESTIMONY REGARDING EVIDENCE OF OTHER CRIMES.
III. THE TRIAL COURT ERRED DURING THE TESTIMONY OF KEITH STOVALL.
IV. LATTIMER'S TRIAL ATTORNEY RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.
V. THE TRIAL JUDGE ERRED IN ALLOWING M.R.E. 803(25) TESTIMONY.
VI. THE TRIAL JUDGE ERRED REGARDING JURY INSTRUCTIONS.
VII. THE TRIAL JUDGE ERRED BY DENYING LATTIMER'S DISPOSITIVE MOTIONS BECAUSE THE EVIDENCE ADDUCED WAS INSUFFICIENT TO SUPPORT THE VERDICT.
VIII. THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS IN THE TRIAL DENIED THE DEFENDANT HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL.
Finding no error, we affirm.

FACTS
¶ 3. Amy lived in Walthall County with her parents, Mark and Ruth, and her two older sisters Cathy and Beth.[1] When Ruth was thirteen years old, she developed a close friendship with a girl named Tuawanna Kennedy. They remained close friends over the years. Ruth married Mark and started a family. Tuawanna married a man named Patrick Lattimer. They both lived in Walthall County, Mississippi.
¶ 4. On Friday July 18, 2003, both Mark and Ruth had to work. Since school was out for the summer, Amy, then ten years old, stayed home with her older sisters, Cathy and Beth. Amy sat in Cathy's bedroom. As Beth played on the computer, Cathy read an article in Seventeen magazine. Having heard mention of the word "rape," Amy asked Cathy, her oldest sister, about the meaning of the word. At trial, Cathy testified that she responded, "it's like when someone touches you where you don't want to be touched." Amy told Cathy that Patrick Lattimer touched her inappropriately on at least three separate occasions.
¶ 5. Cathy telephoned Mark and asked him to come home immediately. Mark was remodeling a house at the time. Mark called Ruth and then drove home. Ruth worked in a medical capacity. Because of the nature of her duties at work, Ruth could not leave immediately. After Ruth talked to Mark, she called Tuawanna. Ruth relayed her conversation with Mark. In response, Tuawanna told Ruth that she was going to talk to Amy.
¶ 6. Tuawanna arrived before Mark. Tuawanna took Amy into Cathy's bedroom and talked to her. Amy told Tuawanna what she said to Cathy. That is, Amy told Tuawanna that her husband molested her. Cathy testified that Tuawanna told them that she loved them and that she was sorry. Tuawanna left before Mark arrived.
¶ 7. That evening, Mark and Ruth spoke with the girls individually and as a family. Amy told Ruth and Mark the same thing she told Cathy and Tuawanna. The following Monday, Amy spoke with Kelli McKenzie, a social worker employed by the Walthall County Department of Human *211 Services. Ms. McKenzie interviewed Amy.
¶ 8. The next day, Mark and Ruth took Amy to speak with Truett Simmons, an investigator with the Walthall County Sheriff's Office. Deputy Simmons did not speak with Amy at that time. Instead, he contacted the Southwest Mississippi Children's Advocacy Center and scheduled an appointment for Amy. During his trial testimony, Deputy Simmons explained why he did not interview Amy that day. Deputy Simmons explained:
if an incident had just occurred and it's necessary for me to talk to the victim, I will, but because the things that occurred were months prior to this, the thing that we do with young children is to really not talk to them unless it's necessary. The Children's Advocacy Center has trained interviewers, specifically trained interviewers, who are trained to talk to children and a lot more in depth than I am trained to.
¶ 9. On July 31, 2003, Keith Stovall, a therapist with the Southwest Mississippi Children's Advocacy Center, interviewed Amy and her sisters. Deputy Simmons and Ms. McKenzie observed that interview from a separate room. Additionally, Mr. Stovall recorded the interviews on videotape.
¶ 10. At trial, the prosecution called Deputy Simmons, Kelli McKenzie, Keith Stovall, Cathy, Mark, Ruth, and Amy as witnesses. Deputy Simmons, Ms. McKenzie, Mr. Stovall, and Cathy all testified under the tender years exception. Additionally, Mr. Stovall testified as an expert witness in the field of forensic interviewing  an interviewing method in which the counsel asks open-ended and non-leading questions to generate an objective and non-suggestive interview. Mark and Ruth testified about the events that led up to trial.
¶ 11. As for Amy, the prosecution asked her about the first time Lattimer touched her inappropriately. Amy testified that she and her sisters were helping Lattimer and his son clean the Lattimer's house. The prosecution then asked Amy to tell the jury what happened during that visit. Amy testified that Lattimer told her two sisters and his son to clean one part of the house. Then, Amy testified:
And I said, what do I do. And he [Lattimer] said, you're going to clean my room with me. I said yes, sir.
I sat on the bed and said what do I do first. And then he came up toward me and started to hump me and then he french kissed me. And then he, then he unzipped the pants, took out his ding dong and he told, and then he put my mouth up to it like that or something and he made me suck it. And then he, then he peed in my hands.
And then he looked out the window and said, Wannie [Tuawanna] is coming. And then he washed my hands out in the sink. And then he opened the door. Dried my hands off with a towel. Before he opened the door, he dried out my hands with a towel.
Amy explained that the events described above happened before Lattimer's youngest son was born.
¶ 12. Next, Amy testified about the second incident. That time, Lattimer's youngest son was an infant. Amy testified that she visited the Lattimers with her sisters. Further, Amy testified that her sisters left with Tuawanna and went to feed a dog at Tuawanna's mother's house. Amy stayed behind because she wanted to visit with Lattimer's infant son. Amy then testified as follows:
Q. What happened after he did that?

*212 A. I think he told me to go to his room, and I did. I went to his room, like he said.
Q. After you went to his room what happened?
A. He, he laid me down on the bed and started to hump me. And then he said something twice, well, I said it. I said you have a wife and a boy and you shouldn't be doing this.
Q. And what did he say?
A. He started to laugh.
Q. You said he started humping you. What did he do, what do you mean humping you?
A. Like rubbing his body against mine.
Q. Were his clothes all the way on or all the way off or partially on?
A. On.
Q. Huh?
A. On.
Q. Okay. And how were your clothes?
A. On.
Q. After he started doing that, what did he do to you then?
A. He started to french kiss me.
Q. When you say french kiss, what do you mean?
A. Kissing me but with the tongue.
Q. You said kissing you but with his tongue?
A. Yes, sir.
Q. And after he did that what did he do?
A. He started to pull off his pants and  no, he pulled off my pants and then he started to lick my cooter cat.
Q. Lick your what?
A. Cooter cat.
Q. Where is that at? What part of your body are you talking about?
A. In the middle of my legs.
Q. Okay. Did he say anything else to you at that time?
A. Sir?
Q. Did he say anything else to you at that time?
A. What do you mean?
Q. After he did that, what happened?
A. He put back on my pants and then  my pants and then he pulled down his pants and he, then he told me to suck his ding dong. And I kept saying no, and he kept saying please, and I kept saying no.
¶ 13. After Amy's testimony, the prosecution ended its case-in-chief. Lattimer called Tuawanna as his first witness. Tuawanna testified that she once had a close relationship with Ruth and her family prior to Amy's allegations, but she believed Amy accused her husband falsely. Tuawanna also attacked Amy's credibility when she testified that Amy lied "all the time." Next, Lattimer took the stand in his own defense. On direct and cross-examination, Lattimer denied the allegations against him. The defense rested after Lattimer concluded his testimony.
¶ 14. As mentioned, the jury deliberated and found Lattimer guilty of two counts of sexual battery. On March 29, 2004, Lattimer filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for a new trial. The circuit court denied both motions. Lattimer appeals.

ANALYSIS
I. THE TRIAL COURT ERRED DURING JURY SELECTION.
¶ 15. Under this heading, Lattimer raises two completely different arguments in which he suggests that the trial judge erred during voir dire. First, Lattimer complains that the trial judge made improper comments during voir dire. Second, *213 Lattimer claims that the trial judge erred when he failed to excuse a potential juror sua sponte.
¶ 16. The standard of review in examining the conduct of voir dire is abuse of discretion. Burton v. State, 875 So.2d 1120 (¶ 6) (Miss.Ct.App.2004). Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense. Id. This Court shall not disturb a trial court's decision unless it is clearly wrong. Id.

A. The Trial Judge's Comment During Voir Dire
¶ 17. During voir dire, the trial judge told the jury that "the State will put on its proof, call its witnesses, introduce its evidence. After that, the defendant will do the same with its witnesses and its proof." According to Lattimer, the trial judge's comment caused the jury to expect evidence from him. Lattimer claims that the trial judge's comment forced him to present evidence. Lattimer reasons that the jury would view his inaction critically if he failed to present evidence.
¶ 18. Lattimer failed to make a contemporaneous objection. "It is elementary that, for preservation of error for review, there must be contemporaneous objections." Christmas v. State, 700 So.2d 262, 271 (Miss.1997). Lattimer is barred from raising this issue for the first time on appeal.
¶ 19. Procedural bar notwithstanding, considered along with the trial judge's other remarks, comments, and instructions, it is clear this statement did not prejudice Lattimer or somehow mislead the jury. Before he made the comment at issue, the trial judge had commented to the panel that Lattimer was presumed innocent and the prosecution bore the burden of proving him guilty beyond a reasonable doubt. What is more, the trial judge never instructed the venire that Lattimer was required to put on proof. There is no indication in the record that Lattimer felt compelled to offer proof in his own behalf, due to the trial judge's comment. If one were to stretch the imagination and imply that meaning from the trial judge's comment, that implication would have been clear when the trial judge instructed the jury prior to deliberation. At the conclusion of the case, the trial judge instructed the jury that Lattimer was "not required to prove himself innocent, or to put on any evidence at all upon the subject." This assignment of error is meritless.

B. Juror Number Twenty-Two
¶ 20. During voir dire, juror number twenty-two, Fannie Johnson, asked to approach the bench. Out of earshot of counsel and the rest of the venire, Mr. Johnson and the trial judge had the following exchange:
JUROR NO. 22: Your Honor, I can't be fair. I have children.
THE COURT: What if it was one of your child, one of your children, would you not want justice to be served?
JUROR NO. 22: Right.
THE COURT: Would you not want some fair and impartial people on the jury?
JUROR NO. 22: Right. But what I'm saying is  I understand what you're saying, but the way I look at it, if anybody fool around with children, I'm against it.
THE COURT: Well, would that interfere with your ability to be fair and impartial?
JUROR NO. 22: Yes, sir, to the extent, right now.

*214 THE COURT: Well, you better hope your kids never get molested.
JUROR NO. 22: I do.
THE COURT: Because you're going to want some really good people to serve on the jury and you're going to look around and there's going to be somebody standing up there like you that's going to think of an excuse to 
JUROR NO. 22: Really, what I'm saying, Your Honor, is this, the way I look at it if a person is over age, he should know better than to fool with children. And I 
THE COURT: Well, it's not your job to condemn the crime, it is, it would be your job to determine, based on the proof, whether he was guilty or innocent, and that is all.
JUROR NO. 22: I just wanted to clear that up.
THE COURT: Sure, all you just do is decide the guilt or innocence. I am against it too. I am against every crime that's in this book. But if I were on the jury I would have to decide whether they were guilty or innocent based on the proof.
JUROR NO. 22: Yeah, I mean, I just wanted to bring it out. I didn't want you to think I'm trying to get out of nothing. I just want to be honest and fair.
THE COURT: Well, I share your opinion. But your job would be to, based on the evidence, to determine his guilt or innocence.
JUROR NO. 22: Yes, sir. By me being a upright man in my community, as well.
THE COURT: That is the kind of people we need on juries.
JUROR NO. 22: Yes, sir.
THE COURT: Because you hate the crime that's in this book just like I do.
JUROR NO. 22: All right, I just wanted to let you know about it.
THE COURT: Appreciate it, okay.
¶ 21. After the conclusion of voir dire, the circuit court listened to challenges for cause. During those challenges, the prosecutor said, "Judge, can I ask a question before we do this? Juror Number 22 . . . approached the bench in response to a question that I had." The prosecutor then asked the trial judge about the substance of Juror Number 22's conversation with the trial judge. The trial judge answered:
Now 22 said he was violently opposed to the crime. And when I explained that I too was violently opposed to the crime, as I was violently opposed to other crimes in the statute, but it would not be his job to determine whether he liked the crime or not, it would be his job to determine guilt or innocence, based upon the testimony. And when he understood that, then he didn't have a problem.
¶ 22. The trial judge has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. Stigall v. State, 869 So.2d 410(¶ 7) (Miss.Ct.App.2003). Under the circumstances, we cannot say that the trial judge abused his discretion. It is true that Mr. Johnson said, "I can't be fair." However, Mr. Johnson clarified his statement when he said he was opposed to the crime of sexual battery against children. That, without more, could indicate that Mr. Johnson was unfit to serve on the jury. But, the discussion did not end at that point. The trial judge discovered that Mr. Johnson's bias was not toward Lattimer, it was toward the crime. Mr. Johnson later said, "I just want to be honest and fair." The trial judge realized Mr. Johnson was opposed to the crime. Simply being opposed to a crime should not be a *215 reason to find a juror unfit. If so, the only fit juror would be one unopposed to a crime. Because the trial judge did not abuse his discretion, we affirm.
II. THE TRIAL JUDGE ERRED BY ALLOWING TESTIMONY REGARDING EVIDENCE OF OTHER CRIMES.
¶ 23. In this issue, Lattimer claims that the trial court erred when it allowed the prosecution to present evidence that Lattimer touched Amy inappropriately once in Marion County as well as the two incidents in Walthall County. According to Lattimer, that evidence was improper because the indictment referenced the two incidents in Walthall County and made no claim related to an alleged incident in Marion County. Lattimer complains that the multiple references to an alleged incident in Marion County resulted in reversible error.
¶ 24. The standard of review regarding the admission or exclusion of evidence is abuse of discretion. Burton, 875 So.2d at (¶ 6). Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense. Id. This Court shall not disturb a trial court's decision unless it is clearly wrong. Id.
¶ 25. Our review of the record reveals that the prosecution did, in fact, mention an alleged act that took place in Marion County during the prosecutor's opening statement and its closing argument. Additionally, the prosecution elicited testimony about an alleged incident in Marion County during Deputy Simmons's testimony, Kelli McKenzie's testimony, and Cathy's testimony.
¶ 26. Lattimer did not object when the prosecution mentioned the Marion County allegation during opening statements or closing arguments. Likewise, Lattimer did not object during Cathy's testimony or Ms. McKenzie's testimony. "It is elementary that, for preservation of error for review, there must be contemporaneous objections." Christmas, 700 So.2d at 271. Lattimer is barred from raising this issue for the first time on appeal. However, Lattimer requested a mistrial when Deputy Simmons mentioned the alleged Marion County incident.
¶ 27. Deputy Simmons testified that Amy "[g]ave statements, recounted two incidents that had occurred to her. Actually, it was three, but two that occurred in Walthall County." Lattimer's attorney objected and moved for a mistrial. The trial judge denied Lattimer's motion for mistrial and instructed the jury not to consider the alleged incident outside of Walthall County in determining Lattimer's guilt or innocence. Specifically, the trial judge said, "let the record show that each member of the jury nodded their head in the affirmative that they would disregard the statement about an incident which did not occur in Walthall County. . . ." Lattimer argues that the trial judge's admonition was ineffectual to erase that statement from the juror's minds. Lattimer also argues that the trial judge's admonition failed to include the suggestion that an incident "allegedly occurred." Lattimer concludes that the trial judge's admonition amounted to a comment on the evidence.
¶ 28. The Mississippi Supreme Court has discussed this issue in depth.
In Mitchell v. State, 539 So.2d 1366 (Miss.1989), this Court rejected the argument that evidence of a defendant's prior sexual misbehavior with other children is admissible during the State's case-in-chief to show "the system of criminal action and lustful disposition of [the defendant] toward children." *216 Mitchell, 539 So.2d at 1372. This Court held that to allow "testimony that shows a defendant's character of lustful behavior toward children in general, not just [toward the victim at issue]," would "not be consistent with the purpose of M.R.E. 404(b)." Id. This Court concluded that under Rule 404(b) "evidence of other sexual relations [should be limited] to those between the defendant and the particular victim [at issue]." Id. This Court explained that to admit evidence of prior bad acts involving victims other than the one for whom the defendant was on trial would be "[i]nconsistent with the notion that a defendant is on trial for a specific crime and not for generally being a bad person." Id. Accordingly, Mitchell requires an identity of victims in sexual abuse cases, i.e., the prior bad act sought to be admitted must have been committed upon the same victim that the defendant is currently on trial for having allegedly harmed. Consequently, if the evidence of prior bad acts concerns acts committed upon victims other than the one involved in the instant case, the prior bad acts evidence is inadmissible on direct under our rules of evidence. See Elmore v. State, 510 So.2d 127, 131 (Miss.1987) (holding that "the admission of evidence of remote instances of sexual misconduct with someone other than the prosecutrix was reversible error").
King v. State, 857 So.2d 702 (¶ 123) (Miss. 2003) (emphasis in original).
¶ 29. As in King and Mitchell, Deputy Simmons's testimony involved evidence of other alleged sexual relations between the defendant, Lattimer, and Amy, the particular victim at issue. Under the circumstances, Deputy Simmons's testimony was admissible under M.R.E. 404(b). Accordingly, we are of the opinion that the trial judge did not abuse his discretion when he followed the precedent established by King and Mitchell and allowed the prosecution to introduce admissible testimony. We find no error in the circuit court's decision to deny Lattimer's motion for a mistrial.
III. THE TRIAL COURT ERRED DURING THE TESTIMONY OF KEITH STOVALL.
¶ 30. In this issue, Lattimer claims the circuit court erred because it allowed the prosecution to qualify Keith Stovall as an expert witness. Mr. Stovall testified that, as an expert in forensic interviewing of children, he found Amy credible during her interview at the Children's Advocacy Center. In other words, Mr. Stovall testified that, in his expert opinion, Amy told the truth when she said Lattimer molested her.
¶ 31. Once Mr. Stovall took the stand, the prosecution asked him about his education and his professional background. Mr. Stovall explained that he received his bachelor's degree from William Carey College and his master's degree from the University of Southern Mississippi. At the time of trial he was in his second year of employment as a therapist and "forensic interviewer" with the Children's Advocacy Center. He also testified that he attended conferences regarding sexual and physical abuse and the proper counseling methodology involved with counseling children in which he elicits genuine responses, rather than responses that were suggested by the interviewer. Mr. Stovall summarized this when he testified, "essentially, I am trained to get information from kids, from them, and not mixing in my own ideas, just evaluating what they have to say." Mr. Stovall elaborated on his training in counseling children who had been victims of sexual abuse. Mr. Stovall testified:

*217 We have trainings that we go to, annual conferences. I go to at least two or three a year. But the training that I rely on the most is CornerHouse.
* * *
CornerHouse is a child evaluation center in Minneapolis, Minnesota. And I went there for a week when I first began. And there we receive graduate level instruction on child development, child psychology, linguistics, how kids view life, how they experience reality, how they experience abuse, how they go about telling about abuse.
As well as physical, we also, we hear medical information about kids and their bodies and development and about the effect of sexual abuse on children.
But the central issue at CornerHouse is interviewing kids. And so we interview adults who are acting as children who have been abused, trained actors, professional actors. And we are critiqued by the class. The class is watching via closed circuit television. And also we are critiqued by the instructor. So it's an intensive forty-hour course.
Afterwards, the prosecution asked Stovall about "forensic interviewing." The following exchange ensued:
Q. Now, this area you called forensic interviewing?
A. Uh-huh.
Q. What is it? When you say the work forensic, what do you mean?
A. Forensic interviewing is, it's an investigative interview. Although my background and training is in therapy and I do employ a lot of therapeutic techniques with kids, primarily it's an investigative interview.
It's not my investigation. The child who I interview is brought to me by an investigator, whether that be DHS or law enforcement. And they bring the child to me to get a non-biased interview. I am not affiliated with their organization, so I don't benefit from proving that this child has or has not been abused. My job simply is to get the information as best as possible and to make an evaluation of that.
And so it is forensic in the sense that it is in the context of an investigation.
Q. And do you indeed interview children where you do not substantiate what it is that the children are telling you?
A. I do
Q. Are you familiar with literature and research regarding the techniques and procedures and protocols that you use?
A. We do. We refer to them quite frequently.
Q. And have there been any studies that relate to those techniques?
A. Yes, all of the techniques that we are employing have been researched thoroughly and are continuously researched. And part of the reason why I go to these conferences is to get updates on the literature, to get updates on the research, to make sure that the interviewing that we are doing at the center is the best practice.
¶ 32. The prosecution tendered Stovall as an expert in forensic interviewing. Lattimer objected. Specifically, counsel for Lattimer said, "[w]e would object to his qualifying." The jury left the courtroom, and Lattimer's attorney clarified his objection. Counsel for Lattimer explained, "Your Honor, my initial objection to Mr. Stovall as an expert witness is that I have lacked notice that the State intended to use him as an expert witness. I have not been provided with anything about his qualifications or, in any of the discovery." *218 Counsel for Lattimer conceded that he had seen the district attorney's file and that Mr. Stovall's interview was part of the file. Lattimer's attorney explained, "Your Honor, I don't dispute that the witness was disclosed to me, just that, just that I have never been provided any information regarding him as an expert witness." The prosecutor stated that the summary of Mr. Stovall's interview contains Mr. Stovall's report on why he concluded Amy's statements to be credible. Counsel for Lattimer responded, "Your Honor, I don't dispute what I was provided. The nature of my objection is that I don't believe that was sufficient under the rules, particularly the modification to our rules, as we are now under the Daubert standard." Lattimer's attorney stated, "In preparing to voir dire this witness as to his qualifications as an expert, I was not, you know, what his qualifications are as an expert in this particular subject."
¶ 33. The trial judge reviewed Rule 9.04 of the Uniform Circuit and County Court Rules and found that, pursuant to that rule, the prosecution furnished qualifications and reports of expert witnesses. The trial judge found that Lattimer's attorney had ample notice of Mr. Stovall's report. Still, the trial judge gave Lattimer's counsel an overnight recess to allow him the opportunity to study Mr. Stovall's curriculum vitae and to voir dire Stovall regarding his expert qualification the next morning.
¶ 34. The following morning, the circuit court reconvened and, outside the presence of the jury, Lattimer's attorney conducted voir dire as to Mr. Stovall's qualifications.
Q. Okay. And what was it that you are an expert in or hold yourself out to be an expert in?
A. I am qualified  I guess you might need to ask Mr. Tidwell, but, as to what the terminology is  but forensic interviewing, child sexual abuse, child abuse.
Q. Okay. And I have been provided a copy of your report. It is my understanding that you're going to attempt to give an opinion as to the credibility of the statements made by [Amy]?
A. Yes.
Q. Okay. Are you aware of  well, how did you do this interview? What techniques did you use for interviewing her?
A. Well, I did speak to that yesterday. Non-biased questioning, open-ended questions. I did not obtain information from the parents beforehand, so as to increase my, my objectivity.
Q. Are you aware of any literature or peer information in your field that would tend to show that that would be a reliable method of obtaining information?
A. Yes, sir.
Q. What are you aware of?
A. Well, there's tons of research that we rely on that supports our practice. We are not engaging in this practice just because we think it's good. We have lots of research.
Q. Are you aware of any specific studies that would show that information obtained in this method is more reliable than say a polygraph exam, as far as showing truthfulness?
A. I don't think a polygraph would be appropriate for a child because the child is not a criminal.
Q. Okay. But are you aware of any information or any studies that show that your methods are more reliable at determining whether or not the child is being truthful than an exam like that would be?

*219 A. Through research and study, I believe history tells us that the way we used to interview kids is we would take a child in, law enforcement individual would, would berate a child, would use all sorts of inappropriate leading questions. Little Johnny, your friend at daycare told me that so and so did something to you so you go and tell me what happened.
So research and history tells us that there are certain practices that are not only not best practice and not child friendly, but unethical. So not only did this research guard my practice, but ethics guards my practice.
Q. But what I am getting at is the  let me put it to you this way. Do you have any information as to what the possible error rate would be doing your methods, even assuming they were done properly  and I am not saying you didn't  but let's say they were done just like you were supposed to do them, and you're determining whether or not the child is being truthful, do you have any idea what the error rate would be?
A. In some respects truth is very hard to quantify.
Q. Exactly.
A. There is a science, as well as an art to interviewing kids. There are techniques that are proven to be better than most.
Now, in terms of obtaining a child's statement, the way I  now, if I can clarify your question.
Are you questioning my methods in terms of how I am interviewing the child or are you asking me to speak to the assessment of the child's statement?
Q. The methods. At this point in the proceeding it is all about the method. The method has to stand a test of reliability for you to be, it is my understanding, reliability of the method has to be established before you can then give your opinion based on the method that you used.
A. We assess the child's reliability of the statement. But in terms of the reliability of my practice, I'd like to take a minute just to think about that question if that's okay.
* * *
A. Because of the training that I have partaken in, sat under, there is American Professional Society on Abuse of Children, the American  which is APSAC. APSAC endorses certain methods which have, that's the most reliable body of work in the nation, APSAC. Also CornerHouse, the training that I have sat under and that I have experienced has been supported by research. The methods that I adhere to are empirically, they are, methods that I adhere to are best practice. And we adhere to these trainings.
Now, in terms of what is reliable, I do believe that the methods that I employ are reliable as based on the professional integrity of these agencies that we utilize and train under.
Q. Okay. Are you aware of  when we talk about the method, I'm, I have been, it seems to me that your, the conclusions that you wish to come forward with are based on your interview. You believe that the child is being truthful. Is that a fair assessment?
A. It is, but that's speaking differently than the question that you asked. That is based on an assessment that I make.
Now, the assessment that I make of whether the child is credible is because *220 of certain things that the child displayed. And I will be glad to speak to those things.
Q. Sure.
A. The child can provide, if a child is credible, a child can provide the general context of a true statement. Which means that they can provide the who, the what, the where, their affect or their emotions will be consistent with the statement that they are telling. It is a means of evaluating the extent to which a child can paint a whole picture of reality.
Now, a person who is fabricating, especially a ten year old child, does not have the ability to tell us certain things. A ten year old child can't tell us what something tasted like, what something felt like, what something looked like. A child, although that information could be, I guess the argument is, oh, well, someone could have given that child the information. But children don't know about our interview process and they don't know what questions are going to be asked. And so when asked these questions, when I have interviewed kids who are fabricating  and I have  they will come in typically with just a very kind of rehearsed statement. They can't give you the color of the incident, I mean, they can't paint that complete picture as I spoke of earlier.
Q. In understanding that, my question is about the reliability of your method in determining those conclusions. And, specifically, are you aware of any studies, research on that method and the reliability of that method in making those conclusions and are you aware of the error rate? Could you be wrong? You understand?
A. Uh-huh.
Q. And there is a possibility you could be wrong. What is the probability of you being wrong and how reliable are your methods in determining these conclusions. And further 
A. Well, essentially, since I'm making the assessment, I am the method. So essentially, in making the determination of whether I believe this child is credible, I am the person who is making that determination. So you are essentially asking me more so than the method, how reliable am I.
Q. Okay.
A. Well, in this case, I think I'm right, I think I am dead on. In terms of my error, I have never, I have never testified in a Circuit Court case where I asserted that a child was true and have later gone back and said, I made a mistake. That has never happened.
¶ 35. When Lattimer's attorney concluded voir dire, the circuit court found that forensic interviewing incident to child abuse cases had been scientifically established and that Mr. Stovall interviewed Amy in conformity with those techniques and could, therefore, produce a valid opinion. The circuit court also found that Mr. Stovall's specialized knowledge would assist the jury to understand the case and to determine a fact in issue  whether or not Amy was abused. Further, the circuit court found that Mr. Stovall's opinion would be based on sufficient facts and data because he applied his methodology to the facts of the case. Accordingly, the circuit court accepted Mr. Stovall as an expert witness. At that point, Lattimer's trial attorney stated, "Your Honor, for the record, I would like to reflect our objections to his acceptance and our continuing objection to his testimony." With Lattimer's objection noted, Mr. Stovall testified before the jury. Mr. Stovall testified about his training, his interview with Amy, the *221 details of what she told him, his opinion as to her credibility, and the methodology he used to develop that opinion.
¶ 36. Lattimer focuses his argument on the premise that Mr. Stovall's expert opinion was inadmissible because his methodology for arriving at his opinions (a) was not based on a legitimate, recognized field of expertise; (b) cannot be tested for reliability; (c) was not based upon a static principle; and, (d) was based entirely upon Mr. Stovall's subjective belief. That is, Lattimer claims that Mr. Stovall's methodology was not a suitably reliable method to determine credibility, but was only Mr. Stovall's subjective impression of Amy's credibility.
¶ 37. Rule 702 of the Mississippi Rules of Evidence governs admissibility of expert opinions. Pursuant to M.R.E. 702:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 38. "While an expert may not opine that an alleged child sex abuse victim has been truthful, the scope of permissible expert testimony under Rule 702 includes an expert's opinion that the alleged victim's characteristics are consistent with those of children who have been sexually abused. Elkins v. State, 918 So.2d 828(¶ 9) (Miss.Ct.App.2005).
¶ 39. In the preceding issue, we discussed the standard of review applicable to questions regarding admission or exclusion of evidence. For brevity's sake, we will not repeat them here. Applying the standards of M.R.E. 702, and our familiar standard of review, we cannot conclude that the trial judge abused his discretion or that his decision to accept Mr. Stovall as an expert witness was clearly wrong. Mr. Stovall had specialized knowledge through his education, training, and his professional experience in the field of forensic interviewing. Additionally, his knowledge in the form of his opinion, could have been helpful to the jury in deciding whether Amy was sexually abused by Lattimer. We also agree with the trial judge that Mr. Stovall's opinion was based on sufficient facts and that his testimony was the product of reliable principles and methods. Further, we can find no indication that Mr. Stovall failed to reliably apply the principles and methods of forensic interviewing to the facts of the case. Mr. Stovall was suitably positioned to opine that characteristics of Amy's interview are consistent with sexually abused children. See Elkins, 918 So.2d at (¶ 9).
¶ 40. Lattimer seems to further complain that Mr. Stovall's expert opinion was an opinion on Amy's credibility and was therefore inadmissible because it invaded the province of the jury and was unhelpful to their determination. "It is true that, in a child abuse case, a witness's opinion that the alleged victim was telling the truth is of dubious competency and, therefore, is inadmissible." Id. (citing Jones v. State, 606 So.2d 1051, 1057-58 (Miss.1992); Griffith v. State, 584 So.2d 383 (Miss.1991)). The record indicates that the prosecution asked Mr. Stovall whether he, in his report on his interview with Amy, came to a conclusion about her credibility. Mr. Stovall found Amy to be "highly credible." He then testified why he found her highly credible. However, Lattimer did not object when the prosecution *222 asked Mr. Stovall whether he found Amy credible. As such, that particular argument is procedurally barred. Christmas, 700 So.2d at 271.
¶ 41. Furthermore, Amy testified before the jury. The jury had its own opportunity to evaluate her as well as her credibility as a witness. If allowing Mr. Stovall to express his professional opinion of her credibility without defense objection is plain error, which we do not so conclude, then certainly any error was harmless beyond a reasonable doubt. Accordingly, we affirm.
IV. LATTIMER'S TRIAL ATTORNEY RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.
¶ 42. When a party raises an ineffective assistance of counsel claim on direct appeal, the proper resolution is to deny relief without prejudice to the defendant's right to assert the same claim in a post-conviction relief proceeding. Pittman v. State, 836 So.2d 779(¶ 38) (Miss.Ct.App. 2002). "We should reach the merits on an ineffective assistance of counsel issue on direct appeal only if `(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" Id. at (¶ 39) (quoting Colenburg v. State, 735 So.2d 1099, 1101 (Miss.Ct.App.1999)). If we do not consider the issue due to the state of the record, assuming we affirm the conviction, Lattimer may raise his ineffective assistance of counsel claim in post-conviction relief proceeding. Id.
¶ 43. The parties have not entered any such stipulation, and the record does not affirmatively show ineffectiveness of constitutional dimensions. Accordingly, Lattimer may raise his ineffective assistance of counsel claim in a post-conviction relief proceeding.
V. THE TRIAL JUDGE ERRED IN ALLOWING M.R.E. 803(25) TESTIMONY.
¶ 44. Deputy Simmons, Ms. McKenzie, Mr. Stovall, and Cathy all testified under M.R.E. 803(25)  commonly known as the "tender years" exception to the hearsay rule. Prior to their testifying, the circuit court conducted hearings outside the jury's presence and determined that their testimony was admissible. In this issue, Lattimer complains that the circuit court erred when it permitted Deputy Simmons, Ms. McKenzie, Mr. Stovall, and Cathy to testify under M.R.E. 803(25).
¶ 45. Pursuant to M.R.E. 803(25):
A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child . . . testifies at the proceedings.
Further, the comment to M.R.E. 803(25) states that, in order to determine if there is sufficient indicia of reliability, the trial judge should look to several factors, including whether there is an apparent motive on the declarant's part to lie; the general character of the declarant; whether the statements were made spontaneously; and whether suggestive techniques were used in eliciting the statement.
¶ 46. Lattimer claims that none of Amy's statements, as testified to by others under M.R.E. 803(25), were spontaneous. Lattimer submits that they were the results of suggestive techniques and situations. Further, Lattimer complains that *223 the statements were unnecessarily cumulative and unreliable hearsay.
¶ 47. Lattimer also claims that Amy's statements to Cathy were not spontaneous, but were elicited and provoked by Cathy's reading an article that discussed rape. It is true that Amy first alleged that Lattimer sexually abused her after she asked her sister of the meaning of the word "rape." That fact, in and of itself, does not mean her statement was provoked or the product of suggestion. There is nothing in the record that suggests Cathy elicited Amy's response. During the hearing prior to her testimony, Cathy was asked whether she had asked Amy questions "to make [Amy] tell [her]" that Lattimer sexually abused her. Cathy answered, "I think she just basically told me." It is clear from the record that Amy's revelation to Cathy was spontaneous on Amy's part and unexpected on Cathy's. We cannot find that the trial court abused its discretion.
¶ 48. As for Deputy Simmons, Ms. McKenzie, and Mr. Stovall, we cannot find that the trial judge erred when he permitted them to testify under M.R.E. 803(25). Deputy Simmons testified that he did not interview Amy. Rather, he listened as Mr. Stovall interviewed her. Ms. McKenzie interviewed Amy, but she testified that she was trained in a method designed to produce unprovoked answers without suggestion. Mr. Stovall was trained in "forensic interviewing." Similar to Ms. McKenzie's method, Mr. Stovall was specifically trained to elicit non-suggestive and unprovoked responses. This assignment of error is meritless.
VI. THE TRIAL JUDGE ERRED REGARDING JURY INSTRUCTIONS.
¶ 49. In this issue, Lattimer takes issue with six jury instructions. However, Lattimer requested two of the instructions that he presently takes issue with. Lattimer "cannot complain of an instruction which he, not the State, requested." Parks v. State, 884 So.2d 738, 746 (Miss.2004). As such, we will not address those two instructions for that reason.
¶ 50. Additionally, Lattimer acknowledges that his attorney did not object to any jury instructions whatsoever. Accordingly, we will not consider Lattimer's assertion regarding jury instructions. This issue is procedurally barred. Myers v. State, 832 So.2d 540, 543 (Miss.Ct.App. 2002); Wilson v. State, 815 So.2d 439, 443 (Miss.Ct.App.2002).
¶ 51. Otherwise, Lattimer also complains that the trial court failed to give a limiting instruction after a portion of Ms. McKenzie's testimony. Lattimer never requested a limiting instruction. The trial judge cannot be placed in error for failing to give a limiting instruction which Lattimer did not request. Brown v. State, 890 So.2d 901, 913 (Miss.2004).
¶ 52. Finally, in a totally unrelated allegation, Lattimer complains that the trial judge made improper comments as the jurors prepared to deliberate. Again, Lattimer made no contemporaneous objection. It follows that his complaint, made for the first time on appeal, is procedurally barred. Christmas, 700 So.2d at 271.
VII. THE TRIAL JUDGE ERRED BY DENYING LATTIMER'S DISPOSITIVE MOTIONS BECAUSE THE EVIDENCE ADDUCED WAS INSUFFICIENT TO SUPPORT THE VERDICT.
¶ 53. In this issue, Lattimer alleges that the prosecution presented insufficient evidence to prove, beyond a reasonable doubt, that he was guilty of two counts of sexual battery. In challenging the sufficiency of the evidence, Lattimer claims *224 that the prosecution (a) only presented corroborating evidence in the form of hearsay testimony; (b) failed to present any medical evidence to establish that Lattimer had sexual intercourse with Amy; (c) failed to present any physical evidence which established that Amy went inside Lattimer's bedroom. Additionally, Lattimer notes that (d) his testimony and his wife's testimony contradicted Amy's testimony.
¶ 54. When considering a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Bush v. State, 895 So.2d 836(¶ 16) (Miss.2005). If the facts and inferences "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," we must reverse and render. Id. "However, if a review of the evidence reveals that it is of such quality and weight that, `having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).

A. Lack of corroborating nonhearsay testimony
¶ 55. Under this heading, Lattimer suggests that the evidence of his guilt was insufficient because the prosecution failed to present any evidence of sexual battery other than Amy's testimony and corroborating evidence in the form of hearsay testimony. "The uncorroborated testimony of a sex crime victim is legally sufficient evidence upon which to base a conviction." McDonald v. State, 816 So.2d 1032(¶ 7) (Miss.Ct.App.2002). Amy's testimony, alone, is sufficient to prove sexual battery.

B. Failure to prove sexual intercourse
¶ 56. Here, Lattimer suggests that the prosecution presented insufficient evidence of sexual battery when it failed to present evidence that Lattimer had intercourse with Amy. Lattimer is patently misplaced is his understanding of the elements of sexual battery.
¶ 57. "A person is guilty of sexual battery if he or she engages in sexual penetration with . . . [a]nother person without his or her consent." Miss.Code Ann. § 97-3-95(1)(a) (Rev.2000). "Sexual penetration" and intercourse are not the same thing, as sexual penetration could include intercourse, sodomy, or oral sex. Sections 97-3-95(1)(a); 97-3-97(a) (Rev.2000). Amy testified that Lattimer forced her to perform oral sex and performed oral sex on her. Both acts fall within the meaning of "sexual penetration." As such, it is insignificant that the prosecution failed to present evidence of intercourse  proof of such is not essential to present a prima facie case of sexual battery, under the circumstances.

C. Failure to present physical evidence of Amy's presence in Lattimer's bedroom
¶ 58. The lack of physical evidence that Amy had been inside Lattimer's bedroom is inconsequential. While that might be a relevant factor for a jury to consider, the fact remains that Amy testified that she was in Lattimer's bedroom on two occasions during which he committed sexual battery against her. Additionally, Lattimer cites no authority indicating that failure to prove the victim of sexual battery *225 was present at the scene amounts to insufficient evidence that a defendant committed sexual battery.

D. Conflicting testimony
¶ 59. Finally, Lattimer points out that both his testimony and his wife's testimony contradicted Amy's assertion that Lattimer sexually abused her. Lattimer and his wife testified that Amy fabricated her testimony. Obviously there was a conflict in the evidence. The jury sits as the trier of fact, and is charged with resolving conflicts in evidence. Price v. State, 847 So.2d 290(¶ 16) (Miss.Ct.App.2003). In other words, "[d]eterminations of witness credibility are left to the jury." McDonald v. State, 816 So.2d 1032(¶ 7) (Miss.Ct.App.2002). The jury obviously found Amy more credible than Lattimer or his wife.
VIII. THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS IN THE TRIAL DENIED THE DEFENDANT HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL.
¶ 60. If a combination of specific errors, harmless in each instance, accrued so that a defendant was denied a fair trial, we will reverse based on cumulative error. Kolberg v. State, 829 So.2d 29 (¶ 181) (Miss. 2002). We find no error in the circuit court. It follows that there can be no accumulation of errors where there are no individual errors. This assignment of error is meritless.
¶ 61. THE JUDGMENT OF THE WALTHALL COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, SEXUAL BATTERY, AND SENTENCE OF THIRTY YEARS WITH TWENTY YEARS TO SERVE AND TEN YEARS ON POST RELEASE SUPERVISION AND COUNT II, SEXUAL BATTERY, AND SENTENCE OF THIRTY YEARS WITH TWENTY TO SERVE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN YEARS ON POST RELEASE SUPERVISION. COUNTS I AND II ARE TO RUN CONSECUTIVE FOR A TOTAL OF FORTY YEARS DAY FOR DAY AND TWENTY YEARS ON POST RELEASE SUPERVISION THE FIRST FIVE YEARS SUPERVISED REPORTING STATUS AND THE LAST FIFTEEN YEARS NON-SUPERVISED, NON-REPORTING STATUS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
NOTES
[1] To protect her identity, we use fictitious names for Amy and her entire family.