ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Madison County Circuit Court found Calvin Shelton and Reginald Shelton guilty of possession of more than five kilograms of marijuana. The circuit court sentenced each of the Sheltons to twenty-five years in the custody of the Mississippi Department of Corrections followed by five years of post-release supervision. Aggrieved, the Shel-tons appeal and raise four issues. In the interest of judicial economy, we have consolidated their appeals. First, the Shel-tons claim the circuit court erred when it denied their motions to suppress the evidence. Second, the Sheltons claim the circuit court erred when it allowed the prosecution to submit the evidence without a proper chain of custody. Third, the Sheltons claim the circuit court erred when it denied their proffered jury instruction on the constitutional prohibitions against unreasonable searches and seizures. Finally, the Sheltons claim that the verdict is contrary to the weight of the evidence. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On February 20, 2006, Calvin and his brother, Reginald, were traveling through Madison County as they made their way home to Atlanta, Georgia. At approximately 2:00 a.m., Calvin, driving a rental car south on 1-55, encountered Deputy Robert Sanders of the Madison County Sheriffs Department’s Interstate Crime Enforcement Unit. Deputy Sanders had parked his patrol car on the side of the interstate near Gluckstadt, Mississippi. When the Sheltons passed Deputy Sanders’s patrol car, Deputy Sanders pulled out onto the interstate and followed. Deputy Sanders later testified that he followed the Sheltons to “monitor their travel.”
¶ 8. According to Deputy Sanders, the Sheltons twice “failfed] to maintain a single lane [in that the] vehicle was observed weaving off to the shoulder of the road to the center lane.” Deputy Sanders elaborated that the Sheltons “crossed onto the fog line, then back over to the center line.” Deputy Sanders stopped Calvin. According to Deputy Sanders, he had planned to verify that the driver was not intoxicated or too tired to drive, and then give the driver a ticket for careless driving.
¶ 4. Deputy Sanders later testified that he did not know that he had stopped a rental car until he saw a bar code sticker on the window of the rental car. Deputy Sanders asked the driver of the rental car, Calvin, to get out of the car and walk to the back of it with his driver’s license and the rental agreement. Calvin complied and gave Deputy Sanders a valid Georgia driver’s license and a valid rental agreement. However, Deputy Sanders testified that the Sheltons did not make eye contact with him. He also testified that they rummaged through some papers when he asked them to present their rental agreement. Deputy Sanders perceived the Sheltons as being nervous.
¶ 5. Deputy Sanders asked Calvin about the details of his and Reginald’s trip. Cal *1207 vin told Deputy Sanders that he and Reginald were driving home to Atlanta and that they had been to a wedding in New Mexico. Deputy Sanders performed a pat-down examination of Calvin and felt a bulge in Calvin’s pocket. Deputy Sanders asked Calvin what he had felt. Calvin replied that the bulge was “a couple of dollars.”[1] In reality, the “couple of dollars” turned out to be $2,674. Calvin explained that he earned the money by working. Deputy Sanders also asked Calvin whether he had previously been arrested. Calvin responded that he had been arrested before.
¶ 6. Deputy Sanders then approached the passenger side of the rental car and spoke to Reginald. Calvin remained at the rear of the rental car. Deputy Sanders asked Reginald about his and Calvin’s trip. Like Calvin, Reginald told Deputy Sanders that he and Calvin were driving home from New Mexico. However, Reginald’s story was slightly different than Calvin’s. Reginald did not say that he and Calvin had been to a wedding. Instead, Reginald told Deputy Sanders that he and Calvin had been visiting friends. According to Deputy Sanders, Reginald avoided making eye contact with him.
¶ 7. Deputy Sanders returned to the rear of the Sheltons’ car and asked Calvin whether he would consent to a search of the rental car, Calvin declined to consent. Although he did not receive consent to search the rental car, Deputy Sanders retrieved a drug-detecting dog from his own patrol car. Deputy Sanders walked the dog around the outside of the Sheltons’ rental car. The dog “alerted” by the trunk and indicated that it smelled narcotics. Deputy Sanders opened the trunk of the rental car and found a duffle bag inside the trunk. When Deputy Sanders opened the duffle bag, he found a large quantity of marijuana. Calvin and Reginald were arrested and indicted. As previously mentioned, their attempts to suppress the evidence against them were unsuccessful, and they were found guilty of possession of more than five kilograms of marijuana. Aggrieved, Calvin and Reginald appeal.
ANALYSIS
I. THE MOTION TO SUPPRESS
¶ 8. The Sheltons filed a pre-trial motion to suppress the evidence. The circuit court denied their motion. Calvin and Reginald claim the circuit court erred.
¶ 9. “The standard of review regarding the admission or exclusion of evidence is abuse of discretion.” Lattimer v. State, 952 So.2d 206, 215 (¶ 24) (Miss.Ct.App. 2006). “Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense.” Id. The Mississippi Supreme Court has clarified the appropriate standard of review in the event of such arguments, stating that:
The principal components of a determination of [whether there was] reasonable suspicion or probable cause [justifying a traffic stop] will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.
Gonzalez v. State, 968 So.2d 1138, 1141 (¶ 10) (Miss.2007) (quoting Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. *1208 1657, 134 L.Ed.2d 911 (1996)). “[T]he ‘first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact/” Id. “Thus, historical facts are reviewed only for clear error, while determinations of reasonable suspicion are reviewed de novo.” Id. (quoting Ornelas, 517 U.S. at 699, 116 S.Ct. 1657) (footnote omitted).
¶ 10. The Fourth Amendment to the United States Constitution and Article 3 Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures. Dies v. State, 926 So.2d 910, 917-18 (¶ 21) (Miss.2006). “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a ‘seizure’ of ‘persons’ within the meaning of this provision.” Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The Mississippi Supreme Court has held that:
Unless the marijuana was discovered during a legal search, it may not be seized. If it was illegally seized, it may not be admitted into evidence. It is therefore important to examine the legality of the particular intrusions which enabled the police to see this marijuana to determine if these intrusions were outside the legitimate scope of the police’s authority.
Gonzalez, 963 So.2d at 1140 (¶ 9) (quoting Carney v. State, 525 So.2d 776, 785 (Miss.1988)).
¶ 11. There are several exceptions to the Fourth Amendment’s general prohibition of warrantless searches. Id. at 1141 (¶ 12). The exception central to this case is the exception for non-custodial investigatory stops, also known as Terry stops. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). “The United States Supreme Court has noted that swift and necessary actions by officers ‘must be tested by the Fourth Amendment’s general proscription against unreasonable searches and seizures.’ ” Gonzalez, 963 So.2d at 1141 (¶ 13) (quoting Terry, 392 U.S. at 20, 88 S.Ct. 1868). “To stop and temporarily detain is not an arrest, and the cases hold that given reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest.” Id. (citation omitted). “[I]t is imperative that the facts be judged against [the following] objective standard: Would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?” Id. at 1141-42. (citations and internal quotations omitted).
¶ 12. There is a two-fold test to determine whether a law enforcement officer’s search and seizure were reasonable: “(1) whether the officer’s action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place.” Id. at 1142 (¶ 14) (citation omitted). “[T]o satisfy the first prong, the law enforcement officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” Id. (citation and internal quotations omitted).
¶ 13. Deputy Sanders stopped Calvin and Reginald after they drove past him on 1-55. According to Deputy Sanders, the driver of the rental car, Calvin, *1209 crossed over the right fog line and then over-compensated left and crossed the lines that divided two lanes. Deputy Sanders testified that Calvin drove over the fog line and the lane-divider lines twice. A law enforcement officer may stop a vehicle when there is probable cause to believe that a traffic violation has occurred. Walker v. State, 962 So.2d 39, 42 (¶ 6) (Miss.Ct.App.2006) (citing Whren, 517 U.S. at 810, 116 S.Ct. 1769). “A law enforcement officer has the authority to stop a motorist if the officer has probable cause to believe that the person is committing a traffic offense.” Burnett v. State, 876 So.2d 409, 411 (¶ 6) (Miss.Ct.App.2003) (citing Whren, 517 U.S. at 810, 116 S.Ct. 1769). “Any person who drives any vehicle in a careless or imprudent manner, without due regard for the width, grade, curves, corner, traffic and use of the streets and highways and all other attendant circumstances is guilty of careless driving.” Miss.Code Ann. § 63-3-1213 (Rev. 2004). Moreover, “failure to have regard for the width and use of the street by swerving off the side of the road or crossing the marker lines constitutes probable cause for a traffic stop.” Henderson v. State, 878 So.2d 246, 248 (¶ 8) (Miss.Ct.App.2004). Accordingly, Deputy Sanders had the authority to stop the Sheltons.
¶ 14. During the stop, Deputy Sanders observed behavior that, according to him, indicated that Calvin and Reginald were nervous. Deputy Sanders was able to articulate that behavior. Deputy Sanders testified that Calvin and Reginald avoided making eye contact with him. Deputy Sanders also testified that Calvin and Reginald were inconsistent in describing the details of their trip. Calvin told Deputy Sanders that he and Reginald had been to a wedding. Reginald, however, told Deputy Sanders that he and Calvin had been visiting friends.
¶ 15. If, during a traffic stop, a law enforcement officer develops reasonable, articulable suspicion of criminal activity other than what was originally suspected, the scope of the officer’s stop expands and includes the investigation of the newly-suspected criminal activity. Tate v. State, 946 So.2d 376, 382 (¶ 18) (Miss.Ct.App.2006). Consequently, Deputy Sanders retrieved a drug-detecting dog from his own patrol car. To reiterate, Calvin and Reginald were not detained while Deputy Sanders waited for someone to arrive with a drug-detecting dog, because Deputy Sanders had a dog in his own patrol car. “Even without reasonable, ar-ticulable suspicion, the performance of a dog sniff of the outside of a vehicle by a trained canine during a routine, valid traffic stop is not a violation of one’s Fourth Amendment rights against unreasonable searches and seizures.” Jaramillo v. State, 950 So.2d 1104, 1107 (¶7) (Miss.Ct.App.2007). The drug-detecting dog’s positive alerts created probable cause for Deputy Sanders to search the trunk of the rental car. McNeal v. State, 617 So.2d 999, 1006 (Miss.1993). Accordingly, we do not find that the circuit court abused its discretion when it denied the Sheltons’ motion to suppress the evidence. It follows that we find no merit to this issue.
II. CHAIN OF CUSTODY
¶ 16. Calvin and Reginald claim that the circuit court should have suppressed the evidence against them because the prosecution failed to demonstrate a sufficient chain of custody of the marijuana.
¶ 17. “This Court has held that the test with respect to whether there has been a break in the chain of custody of evidence is whether there is an indication of probable tampering.” Nalls v. State, 651 So.2d 1074, 1077 (Miss.1995) (citation omitted). *1210 “Furthermore, this Court has also held that matters regarding the chain of custody of evidence are largely left to the discretion of the trial judge and will not be disturbed unless there appears to be an abuse of discretion.” Id. (citation omitted).
¶ 18. The testimony at trial indicated that Deputy Sanders seized a duffle bag from the Sheltons’ rental car. That duffle bag contained what Deputy Sanders estimated to be twenty-five pounds of what he believed to be marijuana. Sergeant Chris Pecu filled out an evidence tag for the duffle bag. Deputy Sanders gave the duf-fle bag to Lieutenant Randy Tucker of the Madison County Sheriffs Department. Lieutenant Tucker placed the duffle bag in an evidence locker. Deputy Sanders later retrieved the duffle bag and submitted it to the Mississippi Crime Laboratory for testing. After the crime lab ran the necessary tests, Deputy Sanders retrieved the evidence and returned it to an evidence locker. The duffle bag remained in the evidence locker until Deputy Sanders removed it so that it could be submitted at trial.
¶ 19. “The test for the continuous possession of evidence is a determination of ‘whether or not there is any indication or reasonable inference of probable tampering with the evidence or substitution of the evidence.’ ” Milliorn v. State, 755 So.2d 1217, 1224-25 (¶ 30) (Miss.Ct.App.1999) (quoting Wells v. State, 604 So.2d 271, 277 (Miss.1992)). The Sheltons argue that the prosecution failed to demonstrate a sufficient chain of custody because the Madison County Sheriffs Department did not label the smaller bundles of marijuana that were inside the duffle bag. However, “the trial court is vested with sound discretion in determining any questions as to the chain of custody and possession of evidence.” Id. at 1225. “A strong presumption of validity accompanies actions of law enforcement officials with regard to preservation of evidence.” Id. “The proponent of the evidence must show no reasonable inference of material tampering with, or substitution of, the evidence; however, Mississippi law has never required a proponent of evidence to produce every handler of the evidence.” Ellis v. State, 934 So.2d 1000, 1005 (¶ 21) (Miss.2006). We cannot find that the circuit court abused its discretion when it allowed the prosecution to submit the evidence at issue. “In such matters, the presumption of regularity supports the official acts of public officers, and the burden to produce evidence of a broken chain of custody (i.e., tampering) is on the defendant.” Id. at (¶ 22) (citation omitted). The Sheltons did not produce evidence of a broken chain of custody or tampering. They merely raised unfounded allegations based on conjecture surrounding the concept that failure to label the marijuana inside the duffle bag somehow correlated to a broken chain of custody, despite the fact that the actual duffle bag was labeled.
¶ 20. Additionally, the Sheltons claim the circuit court should have excluded the evidence against them because Deputy Sanders estimated that the marijuana weighed twenty-five pounds, but the crime lab reported that the marijuana actually weighed eighteen pounds. We find no merit to this argument. Deputy Sanders’s estimation was exactly that — an estimation. He never testified that he weighed the marijuana. There was no evidence that a portion of the seized marijuana was missing. In Milliorn, 755 So.2d at 1225 (¶ 33), this Court held that when “the only suggestion of tampering is the difference in weight of thirteen pounds or 5% between the weight measured by Officer Davis and that calculated at the crime lab .... [s]uch a small discrepancy does not *1211 indicate tampering that would affect a substantial right of the defendant.” Accordingly, we find no abuse of discretion based solely on a discrepancy involving what a law enforcement officer estimates regarding the weight of contraband and what the crime lab verifies to be the actual weight of contraband. It follows that we find no merit to this issue.
III. JURY INSTRUCTIONS
¶ 21. The Sheltons claim the circuit court erred when it refused to instruct the jury pursuant to the Sheltons’ proffered jury instructions labeled as D-10 and D-ll. Proffered jury instruction D-10 reads as follows:
Under the Fourth Amendment of the United States Constitution, the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be searched.
D-ll reads as follows:
Under Article 8, § 23 of the Mississippi Constitution, the people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.
The Sheltons argue that the circuit court’s failure to grant proffered jury instructions D-10 and D-ll amounted to depriving them of their opportunity to present their defense, which was that Deputy Sanders “conducted an illegal search and planted the dope evidence.” We disagree.
¶ 22. Our standard of review is as follows:
Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case[;] however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
Agnew v. State, 783 So.2d 699, 702 (¶ 6) (Miss.2001).
¶ 23. The circuit court resolved the question of the legality of Deputy Sanders’s traffic stop and the subsequent events that led to his walking a drug-detecting dog around the perimeter of the Sheltons’ rental car. The Sheltons proffer of jury instructions D-10 and D-ll was a veiled attempt to put the issue back before the jury. However, in Cagler v. State, 844 So.2d 487, 492 (¶ 11) (Miss.Ct.App.2003) (internal citation omitted), this Court held that “[i]t is the trial judge’s responsibility, not the juryt’s], to determine the admissibility of the fruits of the search.... It is also a question of law for the trial judge and not the jury to determine whether or not a search warrant was properly issued.” We find no merit to this issue.
IV. WEIGHT OF THE EVIDENCE
¶ 24. In this issue, the Sheltons claim the circuit court erred when it denied their motion for a new trial. We are mindful that as we review the circuit court’s decision to deny a motion for a new trial, this Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005). The supreme court has *1212 further instructed that, when reviewing a trial court’s decision to deny a motion for a new trial:
the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Id. (footnote and internal citations and quotations omitted).
¶ 25. In this issue, the Sheltons reiterate their previous arguments that Deputy Sanders planted the evidence against them; he had no basis to stop them; there were discrepancies in the weight of the marijuana; and the evidence was not properly labeled. In the most basic sense, the crux of the Sheltons’ argument is that Deputy Sanders was not credible. However, based on our standard of review and the resolution of the previous issues raised by the Sheltons, we find no merit to this argument.
¶ 26. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT OF CONVICTION OF POSSESSION OF MORE THAN FIVE KILOGRAMS OF MARIJUANA AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH FIVE YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION IS AFFIRMED AS TO BOTH APPELLANTS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MADISON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ, CONCUR.

. Calvin was honest in that the bulge was money, but the characterization that it was "a couple of dollars" was misleading. Calvin actually had $2,674 in that pocket. In any event, Calvin explained that he had earned that money through his employment.