996 So.2d 112 (2008)
Bryant CARTER, Appellant
v.
STATE of Mississippi, Appellee.
No. 2007-KA-00691-COA.
Court of Appeals of Mississippi.
July 22, 2008.
Rehearing Denied October 28, 2008.
Certiorari Denied December 12, 2008.
*114 George T. Holmes, Jackson, Leslie S. Lee, Nelson S. Estess, attorneys for appellant.
Office of the Attorney General, by Ladonna C. Holland, attorney for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. Bryant Carter was convicted by a Pike County jury of sexual battery of a child under the age of fourteen and was sentenced to life in prison by the Pike County Circuit Court. Aggrieved, he appeals and asserts that the court erred (1) in allowing the expert witness testimonies of Keith Stovall and Dr. Catherine Dixon, (2) in allowing multiple witnesses to testify under the tender years exception to the hearsay rule, (3) in allowing the prosecutor to coach the prosecutrix, (4) in prejudicing the defense with several of its evidentiary rulings, and (5) in sentencing Carter to a constitutionally disproportionate sentence.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. During a separation from her husband, Susan Smith[1] became romantically involved with Carter. In February 2004, Carter moved in with Susan and her children, Sally and Jonathan. Sally was seven years old when Carter moved in. When Carter initially moved in, he and the Smith family lived in an apartment. Sometime around March 2004, Carter and the Smiths moved into a run-down pink trailer, and then into a nicer trailer in July or August 2004. In January 2005, Carter and Susan stopped seeing each other. According to Susan, she forced Carter out of the trailer, while Carter maintained that it was his decision to leave.
¶ 4. Susan testified that she noticed Sally acting oddly after Carter left the home. Sometime in late March or early April 2005, Susan asked Sally what was wrong, and Sally told Susan that Carter had touched her inappropriately. Susan became very distraught. She initially called the police, who told her that she needed to take Sally for a rape kit and examination. This upset Susan, who did not believe that Sally needed to have a rape kit. Susan then called her mother for advice as to what to do. Susan did not give any contact information to the police, nor did she take Sally to be examined.
¶ 5. On April 14, 2005, the Mississippi Department of Human Services (DHS) received an anonymous call informing them that Sally might have been abused. On April 15, 2005, around 8:30 a.m., Kim Weathers, a DHS social worker, went to Sally's school and spoke with her in private. During the brief interview, Sally informed Weathers that Carter had touched her several times, including at least one time when he penetrated her vagina with his fingers.[2] Thereafter, *115 Weathers placed a note on Susan's door, asking her to contact DHS. When Susan received the note, she contacted DHS, and DHS made an appointment for Sally with the Children's Advocacy Center (CAC).
¶ 6. On April 18, 2005, Sally met with Stovall, a forensic interviewer with the CAC. The interview was videotaped and shown to the jury at trial. Although she was not particularly talkative, Sally indicated during the interview that Carter had touched her inappropriately multiple times. She indicated that the inappropriate touching had happened in a reclining chair. Sally told Stovall that Carter had penetrated her vagina with his fingers at least once, and that it had hurt. Sally specifically told Stovall about abuse that occurred while her family lived with Carter in the pink trailer. When asked where her mother was during the abuse, Sally indicated that she was either in her room or cooking nearby. Sally explained that Carter would use a blanket or other object to conceal his actions. Sally explained that she knew she was seven years old at the time of the assault because she had turned eight while they lived in the pink trailer.
¶ 7. After her interview with Stovall, Susan took Sally to be examined by a nurse practitioner. However, the attempted examination was very distressing to Sally, and Susan left with Sally before the nurse had a chance to fully examine Sally. Susan testified that she then took Sally back to the CAC, where someone recommended that Susan take Sally to her general practitioner. Sometime thereafter, Susan made an appointment for Sally with their general practitioner, where a nurse did a cursory examination of Sally. The nurse recommended that Susan make an appointment for Sally with a gynecologist so that a complete examination could be done. On May 10, 2005, Sally was put under general anesthesia for a full examination by Dr. Leigh Cher Gray, a gynecologist. Dr. Gray found that Sally's hymenal ring was stretched significantly and that such stretching was consistent with digital penetration.
¶ 8. Law enforcement was contacted at some point, and Officer Davis Haygood of the Pike County Sheriff's Department investigated the case. As part of his investigation, Officer Haygood spoke with Carter twice. Both times, Carter maintained that he had never molested Sally. Carter indicated that the only time he had done anything out of the ordinary was when he had put medicine on Sally for some sort of vaginal infection. Sally confirmed that she had had medicine for such an infection, but the evidence was clear that Sally was capable of applying the medication herself and that Carter was never allowed to do so.
¶ 9. Multiple individuals testified on behalf of the State at trial. Sally and Susan both testified, as did Weathers and Stovall. Dr. Dixon, an expert in forensic interviewing and child abuse, testified as well. Officer Haygood, Dr. Gray, and Karen Touchstone, the nurse who saw Sally at her general practitioner's office, all testified. In addition, Thomas Gonsalves, a counselor who saw Sally from the time that the allegations arose until trial, testified about his therapy sessions with Sally. Sally's testimony was roughly the same as what she told Stovall, except that she indicated at trial that Carter had touched her when he lived with them in the apartment, the pink trailer, and the nicer trailer. The videotape of Sally's interview with Stovall was also played for the jury.
¶ 10. Carter testified on his behalf, maintaining that he had never inappropriately touched Sally. Dr. Gary Mooers, an expert in child abuse, testified on Carter's behalf as well. Dr. Mooers opined that Sally's behavior during her interview with *116 Stovall was inconsistent with a child who had been sexually abused.
¶ 11. After hearing all the evidence, the jury found Carter guilty of sexual battery by means of digital penetration. The court thereafter heard from Sally's family and Carter's family before sentencing Carter to life in prison.
¶ 12. Additional facts will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Admission of Stovall's and Dr. Dixon's Testimonies
¶ 13. As Carter recognizes, the admission of expert testimony is governed by Rule 702 of the Mississippi Rules of Evidence and case law, specifically Mississippi Transportation Commission v. McLemore, 863 So.2d 31 (Miss.2003). Rule 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
According to McLemore, "the admission of expert testimony is within the sound discretion of the trial judge." McLemore, 863 So.2d at 34(¶ 4) (citing Puckett v. State, 737 So.2d 322, 342(¶ 57) (Miss.1999)). "Therefore, the decision of a trial judge will stand `unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" Id. (quoting Puckett, 737 So.2d at 342(¶ 57)). McLemore adopted the United States Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). McLemore, 863 So.2d at 35(¶ 5).
¶ 14. In adopting Daubert and Kumho Tire, the McLemore court noted:
The Court in Daubert adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. [Daubert, 509 U.S.] at 592-94, 113 S.Ct. 2786. The focus of this analysis "must be solely on principles and methodology, not on the conclusions they generate." Id. at 595, 113 S.Ct. 2786. These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. Id. at 592-94, 113 S.Ct. 2786. The applicability of these factors depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony. Kumho Tire, 526 U.S. at 151, 119 S.Ct. 1167. The Daubert Court emphasized that the reliability inquiry contemplated by Rule 702 "is a flexible one." Daubert, 509 U.S. at 594, 113 S.Ct. 2786.
McLemore, 863 So.2d at 36-37(¶ 13).
¶ 15. Carter argues vigorously that Stovall's and Dr. Dixon's testimonies should not have been admissible because their testimonies cannot be tested and that Daubert specifically lists testability as a *117 factor. However, as the McLemore court noted, Kumho Tire explained why certain factors might not be applicable in every case:
It might not be surprising that in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may not have ever interested any scientist. Nor, on the other hand, does the presence of Daubert's general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy. Kumho Tire, 526 U.S. at 151, 119 S.Ct. 1167. Therefore, the Court determined that it could "neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert" because "too much depends upon the particular circumstances of the particular case at issue." Id. at 150, 119 S.Ct. 1167. Thus, the trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. at 152, 119 S.Ct. 1167. That is, the Daubert factors should be considered "where they are reasonable measures of the reliability of expert testimony." Id.

McLemore, 863 So.2d at 37(¶ 13).
¶ 16. Dr. Dixon admitted that it would be virtually impossible to test the accuracy of forensic interviewing of children claiming sexual abuse, as such testing would necessarily involve first sexually abusing a child and then observing the child's responses to questioning. However, as Kumho Tire noted, not all the Daubert factors will be applicable in each case. Clearly, the accuracy of forensic interviewing is largely untestable, and that Daubert factor therefore does not apply when determining the admissibility of such an expert's testimony. We note that there is no evidence to suggest that the testimonies in question from Stovall and Dr. Dixon failed to meet any of the other factors. Further, the procedure followed by Stovall is peer-reviewed, has general acceptance in the relevant community, and has standards that control the technique's operation. In fact, Carter's own witness, Dr. Mooers, indicated that he had no problems with the procedure followed by the CAC.
¶ 17. Furthermore, the testimonies of experts such as Stovall and Dr. Dixon have been admitted in numerous cases. For example, this Court found no error with a court's decision to admit Stovall's testimony in Lattimer v. State, 952 So.2d 206, 221(¶ 39) (Miss.Ct.App.2006). We found:
Mr. Stovall had specialized knowledge through his education, training, and his professional experience in the field of forensic interviewing. Additionally, his knowledge in the form of his opinion, could have been helpful to the jury in deciding whether Amy was sexually abused by Lattimer. We also agree with the trial judge that Mr. Stovall's opinion was based on sufficient facts and that his testimony was the product of reliable principles and methods. Further, we can find no indication that Mr. Stovall failed to reliably apply the principles and methods of forensic interviewing to the facts of the case. Mr. Stovall was suitably positioned to opine that characteristics of Amy's interview are consistent with sexually abused children.
Id. Carter attempts to distinguish Lattimer on the ground that "[i]n Lattimer there was improper testimony about witness `credibility;' but there was no preserving objection, so the court did not address it." However, Stovall did not comment on Sally's credibility in the present case; he *118 merely stated that he found her story consistent with that of a sexually abused child. Therefore, the issue in Lattimer that was not preserved was not an issue at all in this case. Nothing in Lattimer indicates that this Court did not accept the "general" admissibility of Stovall's expert opinion.
¶ 18. Other cases have also admitted the testimonies of such experts. In Williams v. State, 970 So.2d 727, 734-35 (¶¶ 24-27) (Miss.Ct.App.2007), we found admissible the testimony of a social worker who testified that the child's account of her sexual abuse was consistent with that of a child who had been sexually abused. In Walls v. State, 928 So.2d 922, 929(¶ 20) (Miss.Ct.App.2006), we found that Stovall's testimony was admissible under Rule 702, although we noted that there had been no objection to his testimony and that the issue in that case was procedurally barred. We also admitted the testimony of a different forensic interviewer in Mooneyham v. State, 915 So.2d 1102, 1104 (¶¶ 5-6) (Miss. Ct.App.2005).
¶ 19. Carter further contends that Stovall asked too many leading questions during his interview of Sally. As an example, he points out "did he move his fingers around?" However, this is an incomplete rendition of what Stovall asked Sally. Specifically, Stovall asked, "Did it [his finger] move or stay still or something else?" Testimony indicated that asking questions with multiple options is part of the technique taught to forensic interviewers. The question equally suggested three answers: move, stay still, or something else. The Mississippi Supreme Court has defined a leading question as one that "suggests to the witness the specific answer desired by the examining attorney." Tanner v. State, 764 So.2d 385, 405(¶ 58) (Miss.2000) (quoting Clemons v. State, 732 So.2d 883, 889(¶ 25) (Miss.1999)). The questions asked by Stovall, by and large, did not suggest specific answers to Sally. Carter's contentions to the contrary are without merit.
¶ 20. Carter also criticizes Stovall's opinions regarding his accuracy: "Stovall said, he had never been wrong, but there were occasions when juries did not agree with him.... Juries are wrong, not him." This is a mischaracterization of Stovall's testimony. Stovall testified that he did not know of any cases where he had been wrong, i.e., he had never been shown to be conclusively wrong. As we have already discussed, forensic interviewing of sexually abused children is a field of expertise that is largely untestable. Therefore, it makes sense that Stovall does not know of any times when he has been proven wrong. In fact, when asked whether he had ever been wrong, Stovall replied, "I'm sure I have." When asked about juries finding differently than him, the following exchange occurred:
Q. So if a jury disagrees with you, that doesn't necessarily mean you're wrong. Is that what you're telling me?
A. I think it could mean that there was not enough evidence to prove abuse, or perhaps, for whatever reason, the case that presented [sic] wasn't as strong as it needed to be.
Stovall never claimed that he had never been wrong; in fact, he admitted that he probably had been wrong before. However, he stated that he did not know of any such incidents.
¶ 21. Carter argues at length that Stovall and Dr. Dixon unreliably applied their analyses to Sally's story.[3] Carter complains *119 that Stovall and Dr. Dixon cited both lack of detail and the presence of detail as an indicator of reliability. An in-depth look at Stovall's and Dr. Dixon's testimonies explains this apparent inconsistency. Stovall testified, in part, during his direct examination as follows:
Q. Would you describe what you observed [during Sally's interview at the CAC], please.
A. Well, I found her to be a lot more withdrawn, a lot more soft spoken when discussing sexual abuse.... [E]very time that I would return to talk about sexual abuse, you'd see her affect or her facial expressions shift. I believe we're talking about a birthday party or something approximately 15 to 25 minutes in the interview in the heart of the interview there, and I come back and I ask her about the touching again, and her eyes drop down, her vocal volume decreases substantially, and the eye contact diminished as well.
Q. How manyI know you answered that before. About more than 500[sic] children you've done forensic interviews on?
A. Uh-huh (Affirmative Response).
Q. About what percentage of those are for sexual abuse or concerning sexual abuse?
A. Majority. We also interview children who are physically abused. In some cases there was both involved.
Q. In casesyour cases involving sexual abuse, in your experience is the change of demeanor, the lowering of the voice consistent withhave you seen that before?
A. Quite frequently in cases where childrenwhen wewhen we give a finding of [sic] consistent with abuse, you'll see that when children are talking about playing with friends or when they're talking about spending time with family, you'll see them upbeat, you'll see themthat's kind of their standard affect. But when they discuss sexual abuse, and when you see some sort of emotional shift, oftentimes it's because of the subject matter.
Q. What are some of theI asked you earlier about whether you're trained to look for signs of coaching or fabrication or motivation to lie. What are some of the markers for you to show signs of fabrication?
A. Well, if there's not really a[sic] affect shift. Many cases, interviews where I was interviewing children, and there was some sort of fabrication that was suspected or coaching suspected, seems kind of flat [sic]. You don't see that emotional breakdown at a certain point in time. For instance, if a child's talking and all of a sudden they mention an abuse scenario, and you see a shift in emotion, then that's significant. In this case the only times that she's not answeringand there's a couple times where she says, "I don't know," but times when she doesn't answer, I counted there's five of those times. Three of those specifically were when she was asked to identify the genitals, so she doesn't identify that. That's significant. *120 That's the kind of thing that I'm looking at.
* * * *
Q. Based upon your training and your extensive experience with interviewing sexually-abused children, were [Sally's] demeanor and attitude consistent or inconsistent with the content of the information she was providing?
A. I'd say it's highly consistent. The reason being is that, as I mentioned before, when she does not answer, it was specifically around the abuse scenario, and that's seen quite frequently.
* * * *
Q. Mr. Stovall, during your training for your psychology degrees and to become a forensic interviewer and your training concerning child sexual abuse, have you learned within that training, have you been taught what sorts of factors affect memory in these type of situations?
A. Yes, I have.
Q. And what are those factors?
A. Well, there's actually a good body of research that indicates that trauma is a diminisher to memory. For individuals who go through trauma or have experienced a traumatic effect, there's going to be an inability or difficulty to remember that. If you've been in a car wreck, a very violent car wreck, you can remember thatthere may or may not have been details about that car wreck that you could remember. But as safetyas time goes on, you can find yourself remembering more details. But there is a lot of research published within the past ten years that has indicated that trauma is, in fact, a diminisher on memory.
During Stovall's cross-examination, Carter's attorney attempted to clarify Stovall's findings as to Sally's reticence:
Q. Would you agree with me that a child of that age, you would expect that they would become more silent and have problems talking about sex in general?
A. Well, she explained thatshe told me that sheduring the touch inquiry or the anatomy ID she points out the buttocks, sheso she was not necessarily discomforted by that. That is a private part. So the anxiety didn't seem to be there as it was with the genitals. Yes. And I would say that children are nervous when talking about sex, but I've talked to lots of kids who haven't been abused, and many of those kids, there's not that shift. So it's not that she couldn't name those, but it's theif youhere again, I talked about the number of "I don't know's" and no answers. The majorityI think a total of 15 questions that she responded [sic] were either "I don't know" or no answers, and all but two of those were in the bulk of the interview section specifically about abuse. So that tells me that talking about just being in the room, being nervous, that didn't affect her earlier.
Stovall's testimony on redirect also addressed Sally's reticence:
Q. Mr. Stovall, was it at all unusual for [Sally] not to say "he touched me" and then immediately provide every detail you could possibly hope for?
A. Yes. My assessment of her is that she's in what we'd call a tentative state of disclosure, meaning that at *121 this point she doesn't want to talk about it, doesn't want to think about it, doesn't want to go through it. So when you ask a question, and she gives you a short answer, that's the clinical theory or thesis behind that.
At no point in his testimony did Stovall actually testify that he found the presence of details to be more consistent with the story of a sexually abused child. Stovall did note his suspicion that if Sally had been coached, "whoever would have coached her would have told her what to call the genitals." In this limited sense, Stovall suggested that Sally's lack of details was more consistent with a true account of sexual abuse.
¶ 22. Dr. Dixon testified at length about what the presence or absence of details indicates in reference to the consistency of a child's story. During direct examination, Dr. Dixon testified in part:
Q. Tell us, if you would, what studies you're familiar with and what your own experience has taught you concerning how children disclose sexual abuse. What's that  is it a process? Is it an event?
A. You know, there's almost a  it's almost a common knowledge among people who do this work that children disclose abuse as a process. It's rarely [sic] that a child raises their hand and says, "Let me tell you everything that happened to me, and I'm going to start at the beginning and end at the end and tell you every detail in between." That's just extremely unusual....
* * * *
Q. Dr. Dixon, you mentioned tentative disclosure. What are the types of disclosure, or stages, I should say?
A. Well, in the process of disclosure, you know, like I said, a lot of children don't ever tell, some children wait a long time to tell, and then when they do tell there's a tentativeness about their disclosure. "I think this happened," or "I'm sure, but I think I forgot," or "Maybe it was this way, and maybe not," because they're anxious, they're afraid....
* * * *
Q. Dr. Dixon, what is meant by "active disclosure"?
A. That's when the child is feeling comfortable enough to tell most or all of what happened.
Q. When you reviewed the videotape of [Sally] and when you  strike that. When you reviewed her videotape, did your training and experience in child sexual abuse and development allow you to form an opinion about whether or not she was in a stage of tentative or active disclosure?
A. I thought she was somewhere between tentative and active. There were some tentative elements to what she said, but at the same time she answered the questions asked of her and seemed to be motivated to give clear and correct answers. She even at times redirected or corrected [Stovall] when he asked her questions that weren't exactly how she wanted to portray information.
Dr. Dixon was further asked about details during cross-examination:
Q. Mr. Stovall indicated that the interview that he conducted with [Sally] provided detailed information. Do you agree with that?
A. For her developmental age, yes.

Q. You believe that was detailed?

*122 A. She told who did it, where it happened, how it happened, what happened, how it made her body feel. She drew a picture of the place it happened and the chair that it happened in and told where her mother was and what he covered her with. That's a lot of detail for an eight year old.
Q. Was she able to tell what she was wearing?
A. No. And, you know, that was one of those questions that I underlined in my notes that he asked her. She already told him it happened a lot of times, and then he said, "What were you wearing?" So as a child she's sitting there thinking, "Which time?" You know, so she wasn't able to say that. Because children aren't like adults. They don't come back and say, "Please clarify your question for me because I didn't understand that." They just say, "I don't know," or "I forgot." That was a typical response.
* * * *
Q. If a child is able to remember more details than [Sally] was able to remember, is that consistent with abuse?
A. Could be.
Q. As well as remembering as few as [Sally] remembered?
A. Yes.
(Emphasis added). Dr. Dixon also discussed the value of details during her pretrial voir dire. At that time, she explained:
We train interviewers, and I supervise interviewers to have as their understanding, when they walk into a forensic interview, that something could have happened to this child or nothing could have happened to this child. We collect background information on the case so that we can inform our questioning, but we also keep, as a condition of our listening, an objective stance, that nothing could have happened or something could have happened. As a result of that and as a result of assessment of all of the factors gleaned from the forensic interview  the child's development, the child's affect, the child's vocabulary, the way they phrase their statements, their eye contact, the contextual details provided in the interview, the child's knowledge, or lack thereof, of human sexuality, the child's ability to describe the alleged offender's behavior  all of those factors are weighed, considered, and then a finding is generally given as to we don't think that this child is abused, the interview is inconclusive, we don't know, or we think that the child's disclosure was credible and that abuse may have occurred.
During cross-examination pretrial voir dire Dr. Dixon testified as follows:
Q. The last sentence on the first page. "Her description of the touching contained significant details that a child would not likely have knowledge [of] or motive to fabricate."
A. Right.
* * * *
Q. You also indicate on the second page of that report, second sentence, "Developmentally [Sally] is still at the age that she would have had difficulty fabricating a story about sexual abuse which would contain sufficient information to sound feasible and accurate to adults." Again, that statement was made without having the benefit of her background information; is that correct?

*123 A. That's correct.
Q. And there you're talking specifically about this victim and not generally victims in her position; would you agree with that?
A. No, I was talking generally about victims of her age. Developmentally they typically have very limited knowledge of sexual anatomy, sex offender behavior, et cetera.

* * * *
Q. Can you tell me what indicators you use as an interviewer to determine whether you believe a child's story is consistent with truth [sic]?
A. There's some very specific and some very nonspecific indicators of a child's credibility and the credibility of their statement. Nonspecific factors would be the child's affect, the child's tone of voice, the child's eye contact, the child's  just their general presentation in the interview. I don't think that those factors have been scientifically tested or  you know, and they fall more into the art rather than the science of doing forensic interviewing. Other factors which influence a child's credibility obviously would be the number and quantity and quality of contextual details that the child can provide. If a child  especially a young child  can tell us what happened, where it happened, who did it, how they did it, under what circumstances they did it, how it felt, what their body felt like, where other people were in relation to them when this happened, that's a quantity of contextual detail that we know, depending on the child's developmental stage, would be very, very difficult for a child to either fabricate or carry as a story from another person. Those are factors that lend to a child's credibility.
Q. If a child, as in this case, was interviewed and asked questions and was unable to provide answers to some questions, would that lend itself as a factor or indicator that the child was being truthful or not truthful?
A. It would depend. Sometimes children can't give details because they don't know any. Sometimes children can't give details because there aren't any, or they forgot them. You know, it just depends. And sometimes they're just  you know, it's because the event didn't happen.
Q. If a child was able to give very specific details, would that mean that they were abused?
A. It would lend to the credibility of their statement if they said they had.
Q. But neither one would be able to rule out abuse. Is that what you're telling me?
A. Correct.
Q. So whether they give few details or many details, they both may lend itself [sic] to a finding that is consistent with abuse?
A. And it depends on how old the child is. A teenager who can give a detailed, contextually-rich story about child sexual abuse when that teenager has already been sexually active, has seen sexually-based content on television and in movies, that child has a basis for knowledge about the act of human sex, and that they could produce those details should be of no surprise to anyone. But when you have a prepubescent child with, unless otherwise proven, limited knowledge about human sexuality, and for them to tell an account of bodily *124 touching to be able to describe how it felt, where it happened, who did it, you know, all of those things, it would be fairly unlikely, in my opinion, for the child to be able to fabricate all of that on their own.
(Emphasis added).
¶ 23. As can be seen from an expansive selection of Dr. Dixon's and Stovall's testimonies, their testimonies regarding details did not indicate an unreliable application of the principles of their expertise to Sally's statements. Even Carter's own witness, Dr. Mooers, admitted the following during cross-examination:
Q. I had asked you whether or not you had ever interviewed sexually-abused children who did not give you a lot of detail up front, and I believe that you answered me that a number of the children you've interviewed you've seen more than once after your initial contact, and, yes, you had encountered children who didn't give you detail, some of whom gave you detail later; is that correct? Do you recall that?
A. I don't recall that, but I could have said that. That's true.
Q. All right. It is true?
A. Yeah.
Q. All right. And in some of those cases where you had children who didn't give you much detail, you determined that they probably were sexually abused, didn't you? Not all, just at least some of them?
A. Yes.
* * * *
Q. Would you agree with me that whether or not a child gives detail right up front, that that doesn't necessarily indicate  especially since you've found some have been abused  that wouldn't necessarily indicate they have not been abused, would it? Lack of detail?
A. Lack of detail would not mean for sure that they have  that they're free of abuse, I would agree.
As can be seen, even Dr. Mooers agreed that lack of detail did not necessarily mean that a child had or had not been abused.
¶ 24. Stovall testified that he was satisfied with the number of details that Sally provided, and he never suggested that a child would be credible only if she provided a large number of details. Dr. Dixon further expounded upon this aspect of forensic interviewing, explaining that there are numerous reasons why a child might not be able to provide an interviewer with specific details. Dr. Dixon specifically found that there was nothing wrong with Sally's inability to provide details as to what she was wearing during an assault by Carter. Furthermore, Dr. Dixon explained that older children who have had exposure to sexuality in the media are more likely to be able to provide details regarding a sexual assault. Dr. Dixon indicated that Sally was of an age where it would be difficult for her to provide a substantial number of details. She noted that Sally appeared to be somewhere between active and tentative disclosure. She found that the number of details that Sally was able to provide made her story more consistent with that of a sexually abused child. The record does not indicate that Dr. Dixon or Stovall failed to reliably apply the principles of their expertise to the present case.
¶ 25. The court did not abuse its discretion in allowing Stovall and Dr. Dixon to testify. This contention of error is without merit.

2. Use of the Tender Years Exception
¶ 26. The Mississippi Rules of Evidence provide a tender years exception to the rules prohibiting hearsay:

*125 A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
M.R.E. 803(25). Sally testified at trial and was subject to cross-examination, and Carter does not challenge the reliability of Sally's statement. Rather, Carter contends that there was a prejudicial overuse of the tender years exception. At oral argument, Carter recognized that there was no objection to this repetition of Sally's statement at trial. Therefore, any error would have to be plain error, meaning that Carter would have to "show that there was error, that the error resulted in a manifest injustice, and that it affected [his] fundamental rights." Hicks v. State, 973 So.2d 211, 217 (¶ 18) (Miss.2007) (citing Williams v. State, 794 So.2d 181, 187(¶ 23) (Miss.2001)).
¶ 27. Having reviewed the record, we cannot find that plain error occurred in this case. Besides Sally, eight individuals testified about her outcry statement. Most of those witnesses discussed Sally's statement only as it related to the true purpose of their testimony; for example, Officer Haygood's testimony was mostly about his investigation of Sally's claim and resulting interviews with Carter. Officer Haygood discussed Sally's statement only as it related to his involvement with the case. Similarly, Dr. Gray primarily testified about her medical examination of Sally and discussed Sally's allegations against Carter only as it related to her examination of Sally.
¶ 28. In the absence of an objection, we cannot find that the court erred in failing to sua sponte suggest to the State how to present its case and witnesses. We further note that it is not unusual for multiple witnesses to testify regarding a child's outcry statement in such cases. See Hobgood v. State, 926 So.2d 847, 851-52(¶ 11) (Miss. 2006) (victim declared unavailable; six different witnesses then testified regarding the victim's accusations); Smith v. State, 925 So.2d 825, 830-32 (¶¶ 12-15) (Miss. 2006) (two victims and at least four other individuals testified regarding the victims' allegations); Withers v. State, 907 So.2d 342, 344, 348, 349 (¶¶ 3, 15-16, 20) (Miss. 2005) (at least seven different witnesses testified regarding victim's statements, including the victim).
¶ 29. A manifest injustice did not occur as a result of the State's use of the tender years exception. This contention of error is without merit.

3. Coaching of the Victim
¶ 30. Carter contends that the court erred in allowing the prosecutor to coach Sally during her testimony. The following exchange occurred when Sally was asked by the prosecutor to identify Carter in court:
Q. I want to ask you a question. Do you see Bryant Carter in this courtroom today?
A. I'm not  no, sir.
Q. Okay. I want you to stand up. Okay. Now I want you to look around and see if you see him.
A. No, sir.
Q. Okay. I want you to look over here.
[Objection by Carter's attorney].
A. (Shakes head negatively).

*126 Q. Okay. Do you recognize this man over here? [The prosecutor stood behind one of Carter's attorneys].
[Objection by Carter's attorney].
[COURT]: I'll overrule. Open to cross-examination.
Q. Do you recognize this man right here? I want you to look at him real good.
A. I remember seeing him before going through the courtroom.
Q. Okay. And do you recognize this man right here? [The prosecutor stood behind another of Carter's attorneys].
A. No, sir.
Q. Okay. And I want you to look real good at this man right here. Look at him close. Do you recognize him? [The prosecutor stood behind Carter].
A. Yes, sir.
Q. Who is that?
A. Bryant Carter.
[COURT]: You can sit down.
Q. You can sit back down. The last man that you looked at that you said . And I'd ask that the record reflect that the witness has identified the Defendant.
[COURT]: The record will so reflect.
Q. The things that you told the jury that he did to you, the things that you said that were done to you, is that the person who did them?
A. Yes, sir.
Carter contends that this was "an improper coaching or leading of the witness" and cites to Williams v. State, 539 So.2d 1049, 1052-53 (Miss.1989) as support.
¶ 31. In Williams, a prosecutor signaled a law enforcement officer with his hands during the officer's testimony. Id. at 1052-53. The prosecutor attempted to explain his actions:
With regard to the motion that I made with my hands, what I made was a motion for him to go ahead and now give the information that the Court had previously ruled as inadmissible, that being what he determined, why he determined the probable cause for the arrest. The Court had previously stated that he could not say what Brenda Chance had told him. The Defense Attorney then said, "You wanted him back in jail, why didn't you arrest him again?" And I told him he could now go ahead and say that. That was my sole purpose for my telling him that he could go ahead with that testimony.
Id. at 1052.
¶ 32. Williams is easily distinguishable from our present case. In Williams, the prosecutor candidly admitted that he was attempting to relay information to his witness using his hands. There is no indication that the prosecutor in this case was attempting to relay information to Sally when he stood behind individuals at the defendant's table. Although the prosecutor told Sally to look closely at Carter, he gave similar instructions to Sally when he stood behind one of Carter's attorneys: "I want you to look at him real good." Sally explained that she had difficulty recognizing Carter because his hair was styled differently than it had been when she knew him.
¶ 33. We note that this is not a case where identity is in dispute. Carter has never suggested that he is not the Bryant Carter that Sally referred to in her outcry statements. Rather, he argued that he had never improperly touched her. Carter was not denied his right to a fair trial, and this contention of error is without merit.

4. Evidentiary Rulings
¶ 34. Carter contends that the court erred in three specific incidents. Having *127 reviewed the record, we find no merit to Carter's contentions. For clarity's sake, we address each separately below.

a. Limitation of Cross-Examination
¶ 35. Carter contends that his cross-examination of Stovall was improperly limited: "[D]efense counsel was asking [Stovall] about ... cases where juries had disagreed with him.... Defense counsel asked whether ... Stovall thought the jury was wrong and the [S]tate objected, on unspecified grounds, and the trial court sustained, with the comment that the questions called for a legal conclusion." The exchange that Carter is referring to occurred as follows:
Q. Has a jury ever disagreed with you?
A. Yes.
Q. Do you believe the jury was wrong?
A. That was their findings [sic] and 
Q. Well, it's a simple question. You just stated that you didn't believe you had ever been wrong, and a jury disagreed with you, so 
[PROSECUTOR]: Your Honor, I object.
[COURT]: I'll sustain. It's a simple question, and it's also a question that calls for a legal opinion, so I will sustain.
Q. So if a jury disagrees with you, that doesn't necessarily mean you're wrong. Is that what you're telling me?
A. I think it could mean that there was not enough evidence to prove abuse, or perhaps, for whatever reason, the case that presented [sic] wasn't as strong as it needed to be.
Any harm that Carter suffered as a result of the court's sustaining of the State's objection was cured when his attorney rephrased his question and Stovall responded with a full explanation of why he believed juries had disagreed with him. This specific argument is without merit.

b. Allowing Susan's Testimony
¶ 36. Carter next claims that the court erred in allowing Susan to testify about abuse that she suffered as a child. Susan testified very briefly about what she had been through in an attempt to explain why she reacted so poorly when Sally told her about Carter's assault. Carter contends that the "real reason" for Susan's testimony "was to create a sympathetic emotional reaction with the jury."
¶ 37. We agree that the testimony by Susan was unnecessary and not particularly relevant. We note that Carter's attorney objected on the ground of relevance when Susan first disclosed her abuse, and the court sustained the objection. The court and the attorneys then discussed the statement outside the presence of the jury, and the court found: "It was nonresponsive. You asked her what she did, and she just blurted out that  took us back. I think it may be relevant, but it certainly wasn't responsive." The court then reversed its prior ruling and overruled Carter's objection to the statement. After being asked what "kind of stuff" Sally's situation had brought up for her, Susan testified: "The fact that this was done to me, and my mama did nothing, and I don't want [Sally] to grow up with that feeling." We question the relevancy of the statement in part because Susan's testimony makes no sense. She testified that she did not want Sally to grow up feeling that her mother had done nothing, but Susan then proceeded to do exactly that. Sally's abuse was investigated only after an anonymous call was placed to DHS.
¶ 38. Regardless, the evidence in this case is so overwhelming that any error in admitting the statement was harmless. See Haynes v. State, 934 So.2d 983, *128 991(¶ 31) (Miss.2006) ("errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming") (quoting Clark v. State, 891 So.2d 136, 142(¶ 29) (Miss.2004)).

c. Limitation of Carter's Testimony
¶ 39. Finally, Carter contends that the court erred in limiting his testimony regarding exactly why he had cut his hair since living with Sally's family. Carter argues that his testimony was important to "counter the conclusion that [he] had cut his hair to try to cause misidentification or from some other bad motive...." The following exchange occurred during Sally's testimony when she attempted to explain why she had not been able to recognize Carter initially:
Q. Okay. Does he look any different now than he did before?
A. Yes, sir.
Q. In what way?
A. His hair.
* * * *
Q. Is that why you had a hard time recognizing him?
A. Yes, sir.
Q. How is his hair different?
A. He shaved it kind of around.
During his direct examination, Carter testified about his appearance as follows:
Q. Since the last time that you saw either [Susan] or [Sally], what, if anything, about your appearance has changed?
A. I've taken off my mustache and goatee that I had worn for several years, and I'm dressed in a suit. I normally don't dress in suits.
Q. Okay. And what was the purpose in taking off your goatee?
A. Prospective job interview. It was recommended that I shave it. I'd be more likely to 
[PROSECUTOR]: I object to relevance.
[COURT]: I'll sustain.
¶ 40. We note that the prosecutor objected only when Carter started to explain the benefit that he believed he would obtain from shaving his hair. Carter initially testified uninterrupted about why he shaved his hair: a prospective job interview. A lengthy explanation of why he shaved his hair for a job interview was unnecessary and irrelevant. Therefore, the court did not err in sustaining the objection. Furthermore, we disagree with Carter's statement that it was necessary for him to rebut the conclusion that he had intentionally changed his appearance to create a misidentification. We believe that the prosecutor's exchange with Sally, immediately after Sally had displayed significant difficulty in identifying Carter, did not lead to a conclusion that Carter had wrongfully changed his appearance.
¶ 41. Even if the court erred in sustaining the objection, any error was harmless due to the overwhelming weight of the evidence against Carter.

5. Proportionality of the Sentence
¶ 42. Carter contends that his sentence is constitutionally disproportionate to the crime he committed. As support, he cites numerous cases where sexual batterers of children received more lenient sentences than his.
¶ 43. The statute under which Carter was convicted allows for a minimum sentence of twenty years and a maximum of life. Miss.Code Ann. § 97-3-101(3) (Rev. 2006). Unlike most crimes that carry a potential sentence of life, section 97-3-101(3) does not require that a jury make *129 the determination as to whether the defendant will receive life in prison or some lesser sentence. After hearing from Sally's family and Carter's family, the court sentenced Carter, a first-time offender, to life in prison.
¶ 44. We find that, under current Mississippi law, Carter's sentence is constitutional. Our cases are legion that stand for the proposition that sentences within the statutory guidelines are proper. Tate v. State, 912 So.2d 919, 933(¶ 48) (Miss.2005); Johnson v. State, 904 So.2d 162, 170-71(¶ 25) (Miss.2005); Burchfield v. State, 892 So.2d 191, 202(¶ 45) (Miss.2004); Felder v. State, 876 So.2d 372, 373-74 (¶¶ 7-8) (Miss.2004); Nichols v. State, 826 So.2d 1288, 1290-91 (¶¶ 10-14) (Miss.2002); Wade v. State, 802 So.2d 1023, 1030-31 (¶¶ 35-40) (Miss.2001); Bell v. State, 797 So.2d 945, 950-51(¶ 27) (Miss.2001); Cox v. State, 793 So.2d 591, 599(¶ 38) (Miss.2001).
¶ 45. Notwithstanding the fact that sentences within the statutory guidelines are generally upheld on appeal, if a sentence is "`grossly disproportionate' to the crime committed, the sentence is subject to attack on the grounds that it violates the Eighth Amendment prohibition of cruel and unusual punishment." Tate, 912 So.2d at 933(¶ 49) (citing Hoops v. State, 681 So.2d 521, 537-38 (Miss.1996)). Because Carter was sentenced to life in prison without the possibility of parole, "an extended proportionality analysis" is required. Id. (citing Barnwell v. State, 567 So.2d 215, 221 (Miss.1990)).
¶ 46. Mississippi utilizes the three-factor analysis set out by the United States Supreme Court in Solem v. Helm, 463 U.S. 277, 291-92, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) when determining a sentence's proportionality. The three factors are: (1) the seriousness of the offense and "the harshness of the penalty," (2) the sentences imposed on other defendants in the same jurisdiction, even for other unrelated offenses, and (3) the sentences imposed on other defendants convicted of the same crime in other jurisdictions. Tate, 912 So.2d at 932(¶ 46) (citing Solem, 463 U.S. at 291-92, 103 S.Ct. 3001).
¶ 47. Carter does not dispute that sexual battery of a child less than ten years old is a serious offense that, understandably, warrants harsh penalty. Carter instead focuses on a comparison of the sentences imposed on defendants in Mississippi and other jurisdictions. Regarding the second factor, Carter addresses sentences imposed in Mississippi generally, rather than those imposed by the Pike County Circuit Court. Some of our case law suggests that a proper analysis focuses on the specific jurisdiction, here the Pike County Circuit Court, in which a defendant was sentenced. See Jones v. State, 885 So.2d 83, 88(¶ 14) (Miss.Ct.App.2004).
¶ 48. Significantly, none of Carter's arguments regarding other sentences were presented to the trial court. Rather, every case and statistic was brought up for the first time on appeal. In Edwards v. State, 800 So.2d 454, 468(¶ 44) (Miss.2001), the Mississippi Supreme Court noted that a defendant must bring his statistical information regarding proportionality to the trial court's attention in order to preserve the issue for appeal. In so holding, the court noted that "the appellant has the responsibility to present a trial record sufficient to undergird his assignments of error." Id. (citing Hennington v. State, 702 So.2d 403, 410(¶ 29) (Miss.1997)). Therefore, Carter has failed to properly preserve this issue for our review.
¶ 49. Even had Carter presented the trial court with the information he has presented to this Court, we would still find no merit to this issue. As illustration, we briefly address each of the cases cited by *130 Carter as comparison. As Carter correctly points out, the defendant in Dawkins v. State, 919 So.2d 92, 94(¶ 1) (Miss.Ct.App. 2005) received a sentence of twenty years, with ten years suspended, for the capital rape of his ten-year-old daughter. What Carter fails to mention is that Dawkins received his sentence pursuant to a guilty plea. As such, the case does not provide a useful comparison. The same is true of Caldwell v. State, 953 So.2d 266, 267(¶ 3) (Miss.Ct.App.2007), which Carter also uses as a comparison. Carter also cites Hodgin v. State, 964 So.2d 492 (Miss.2007) and claims that the defendant in that case was sentenced to twenty years. However, Hodgin was found guilty of two crimes: fondling and sexual battery and was sentenced to twenty years for each, with the sentences to run consecutively. Id. at 494(¶ 1). Therefore, Hodgin was effectively sentenced to a total term of forty years. Penny v. State, 960 So.2d 533, 536(¶ 1) (Miss.Ct.App.2006), cited by Carter, involves a conviction for fondling rather than sexual battery, and the defendant in that case accordingly received a more lenient sentence.[4]
¶ 50. Ultimately, the defendants in three cases cited by Carter were convicted of the same or a similar crime but received lesser punishments: Hodgin, 964 So.2d at 494(¶ 1), in which the defendant received a total sentence of forty years, twenty of which was for sexual battery; Mason v. State, 971 So.2d 618, 619(¶ 1) (Miss.Ct.App. 2007), in which the defendant received a sentence of thirty years for sexual battery; and Roles v. State, 952 So.2d 1043, 1045(¶ 1) (Miss.Ct.App.2007), wherein the defendant received a sentence of twenty years for the crime of statutory rape of a thirteen-year-old girl. Although Roles did not involve a sexual battery, the statutory rape of a thirteen-year-old is similar enough to be taken into account in a proportionality analysis.
¶ 51. Carter also cites a 2001 bulletin from the United States Department of Justice which states that the median sentence for sexual crimes against children less than twelve years old is 180 months. David Finkelhor and Richard Ormrod, Offenders Incarcerated for Crimes Against Juveniles, 10, Juvenile Justice Bulletin, December 2001. What Carter fails to note is that that figure is for a wide variety of sex crimes against children, not simply sexual battery. Id. at 6. Other sexual crimes against children, such as exposure or fondling, generally carry less severe penalties than the sexual battery of a child. Furthermore, the authors of the article in question indicated that the survey data they used was of questionable value because it did not take into account all offenders and because of the way the sentences in the survey were examined. Id. at 6. Therefore, the bulletin provides no help to Carter.
¶ 52. Carter also contends that had he been indicted federally under 18 U.S.C. § 2242 (2006), his maximum sentence would be twenty years. Section 2242 currently prescribes a maximum penalty of "any term of years or life." Prior to 2006, the statute allowed a maximum sentence of only twenty years. 18 U.S.C. § 2242 (2000). Section 2242 states:
Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly 

*131 (1) causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping); or
(2) engages in a sexual act with another person if that other person is 
(A) incapable of appraising the nature of the conduct; or
(B) physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act;
or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.
18 U.S.C. § 2242 (2006). Although § 2242 would have carried only a twenty-year maximum sentence if Carter had been prosecuted under the former version of the statute, it is unlikely that § 2242 would have applied to Carter. Rather, Carter's conduct would have fallen under 18 U.S.C. § 2241(c) (2006), which states:
Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly engages in a sexual act with another person who has not attained the age of 12 years ... or attempts to do so, shall be fined under this title and imprisoned for not less than 30 years or for life.
A sexual act is defined, in part, by 18 U.S.C. § 2246(2)(C) (2006), which states: "the term `sexual act' means ... the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person...." Therefore, Carter's conduct properly falls under § 2241, which deals with "sexual acts" against children and which, as already discussed, would provide a maximum sentence of life.[5] Carter's contentions that he could have received only a twenty-year sentence under federal law are wholly without merit.
¶ 53. Carter further contends that under the United States federal sentencing guidelines, he would have received a sentence between 151 to 188 months.[6] However, Carter provides no examples of actual sentences received in federal court. The Solem factors indicate nothing about the applicability of possible or potential sentences; rather, the factors require that we look at the actual convictions of other defendants in a position similar to Carter's. However, Carter has not provided any actual examples of defendants sentenced for similar crimes outside of Mississippi.
*132 ¶ 54. Although there are certainly Mississippi cases where defendants have been sentenced to less than life for the crime of sexual battery or other similar crimes, there are also numerous cases where life sentences have been given by our appellate courts for such crimes. Hobgood, 926 So.2d at 856-57 (¶¶ 33-35); Renfrow v. State, 882 So.2d 800, 802(¶ 2) (Miss.Ct.App. 2004); Gilmore v. State, 872 So.2d 744, 746(¶ 1) (Miss.Ct.App.2004); Sanderson v. State, 872 So.2d 735, 736(¶ 1) (Miss.Ct.App. 2004). We note that the crime that Carter has been convicted of did not carry a potential life sentence until 1999. Therefore, defendants prior to 1999 could not receive a life sentence for the crime of sexual battery. Furthermore, the fact that other similarly situated defendants received lighter sentences "does not prove that the sentenc[e] imposed here [is] grossly disproportionate to the crime committed." Jones, 885 So.2d at 88(¶ 14) (quoting Womack v. State, 827 So.2d 55, 59(¶ 13) (Miss. Ct.App.2002)).
¶ 55. Having reviewed the Solem factors, we find that Carter's sentence is not grossly disproportionate. Accordingly, this contention of error is without merit.
¶ 56. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] The names of the victim and her family members have been changed to protect the victim's identity.
[2] Sally consistently had trouble identifying genitalia by name. For clarity's sake, we have identified the body parts that Sally pointed to in her interviews.
[3] Carter also points out a statement by Stovall to the effect that he could only evaluate himself, not Sally. Carter contends that this remark makes Stovall's testimony inadmissible under Rule 901 of the Mississippi Rules of Evidence. We note that this was an isolated comment from Stovall, ultimately intended to explain, again, that it is impossible to test whether a child has actually been sexually assaulted. Stovall clearly evaluated Sally's credibility and concluded that her story was consistent with that of a sexually abused child.
[4] The fondling statute prescribes a minimum sentence of two years and a maximum of fifteen. Miss.Code Ann. § 97-5-23(1) (Rev. 2006).
[5] Section 2241 has provided a maximum penalty of life since at least 1986.
[6] We note that Carter is incorrect regarding the calculation of his recommended sentence under the Federal Sentencing Guidelines. The 2007 Federal Sentencing Guidelines provide a base offense level of thirty-eight for a conviction under § 2241(c). Sentencing Guidelines Manual, § 2A3.1(a)(1). If Sally were considered to be under Carter's "custody, care, or supervisory control" at the time, the base offense level would increase to forty. Id. at § 2A3.1(b)(3). Even if no other aggravating factors were found, the sentencing table in the 2007 guidelines prescribes a sentence range of 235 to 293 months for a base offense level of thirty-eight and a sentence range of 292 to 365 months for an offense level of forty. According to the table, if just two more points were added to Carter's base offense level, the recommended punishment range would include life.